MACGRANE COXE, as Receiver, etc., Appellant, v. THE STATE OF NEW YORK, Respondent.

The title of the state to the seacoast and the shores of tidal rivers is an incident and part of its sovereignty, which cannot be surrendered, alienated or delegated, except for some public purpose or some reasonable use which can fairly be said to be for the public benefit.

A grant made by the legislature not within the limits of the powers possessed by the state does not constitute a contract between the state and the grantee which is beyond the power of revocation by a subsequent legislature.

Power conferred by the legislature upon a public body for a special purpose and applicable to a particular case is not taken away by the passage of a subsequent statute, general in its language, scope and application; the power is deemed to be repealed only when the language of the later statute discloses such an intention, or where the two enactments are so repugnant to each other that both cannot stand.

The provisions of the act " to authorize the drainage of marsh lands" (Chap. 844, Laws of 1868, amended by chap. 282, Laws of 1869), so far as they attempt to confer upon the corporation organized under the act the right of property in the lands and dominion over the waters designated,

are repugnant to the provision of the Federal Constitution (§ 8, art. 1), which confers upon congress the exclusive power to regulate foreign and interstate commerce.

The said act is also violative of the provision of the State Constitution (§ 16, art. 3), which provides that no local or private bill shall be passed embracing more than one subject, and that shall be expressed in the title.

The said act was, therefore, wholly ineffectual to divest the state of its ownership of the lands under water referred to therein or to vest any right in or title to the same in the corporation.

But *held,* that a corporation having been organized under said act, and it having assumed and exercised corporate powers thereunder, it became a corporation *de facto* if not *de jure,* and it required the judgment of a competent court or an express act of the legislature to terminate its existence.

The corporation accepted the powers and franchises conferred by the act and paid into the state treasury the amount fixed by the commissioners appointed under the act, as the value of the state lands under water sought to be granted by the state to it, and thereafter the powers and franchises so sought to be conferred having been taken away by the Repealing Act of 1875 (Chap. 257, Laws of 1875), *held,* that the company had a just claim against the state for the amount so paid; and that a receiver of the corporation appointed by order of the court had a sufficient standing to enforce the claim.

The company in April, 1876, filed with the commissioners of the land office a claim for the money so paid, as authorized by said Repealing Act. The commissioners laid the claim upon the table and took no further action in regard therto. Upon application of one of the creditors of the corporation an act was passed in 1884 (Chap. 317, Laws of 1884) authorizing the payment of judgments against the company, recovered before the passage of the Repealing Act, and appropriating money for that purpose. In proceedings before the Board of Claims to recover said claim, *held,* that it was not barred by the provision of the State Constitution (§ 14, art. 7) prohibiting the audit and payment of any claim which as between citizens of the state would be barred by lapse of time; that the legislature had power to constitute the commissioners of the land office a tribunal to audit the claim, and that this was done in and by the Repealing Act; that the presentation of the claim to that tribunal was equivalent to the commencement of a suit between individuals and suspended the operation of the Statute of Limitations; that the direction in the act requiring the commissioners to report to the next legislature was not a limitation upon their powers, but was merely directory, and so jurisdiction was not lost by failure to comply with that direction, nor was the power conferred upon them repealed or in any way affected by the passage of the act (Chap. 444, Laws of 1876) creating the board of audit; that, therefore, the claim was still pending before the commissioners at the time of the passage of the act of 1893 (Chap. 425, Laws of 1893) transferring all

such claims to the Board of Claims; and that the claimant was entitled to recover the amount so paid by the corporation with interest from the time of filing the claim, less the amount paid by the state under the appropriation of 1884.

(Argued December 18, 1894; decided January 15, 1895.)

APPEAL from an award of the Board of Claims, made May 26, 1894, which directed an award of nothing to be entered.

The facts, so far as material, are stated in the opinion.

*Julien T. Davies, E. B. Hinsdale* and *Byron Traver* for appellant. The general scheme of the act of 1868 was unconstitutional; the right to dyke was, therefore, destroyed, and, hence, the grant of land under water fell with the rest of the act and was void for uncertainty. (*Stuart* v. *Palmer*, 74 N. Y. 183; *Kean* v. *D. D. Co.*, 45 N. J. L. 91; *Wurts* v. *Hoagland*, 114 U. S. 613; *Carter* v. *T. W. Co.*, 18 N. J. Eq. 53; *Wheeler* v. *Spinola*, 54 N. Y. 377, 388; *Rollin* v. *Pickett*, 2 Hill, 552; *Jackson* v. *Rosevelt*, 13 Johns. 96.) Section 12 of the act of 1868, so far as it authorized the grant of lands under water to the Marsh Land Company, was null and void. (*Langdon* v. *Mayor*, etc., 93 N. Y. 129; 3 Wash. on Real Prop. [4th ed], 118 ; Black's Pomeroy on Water Rights, § 240 ; Gould Law of Waters [2d ed.], §§ 18, 44 ; Angell on Tide Waters, 158 ; Angell on Highways [3d ed.], § 53 ; Tyler's Law of Boundaries, 33, 40 ; Hall's Essay on Seashore, 296 ; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 71 Hun, 160 ; *Dermott* v. *State*, 99 N. Y. 701 ; *Smith* v. *City of Rochester*, 92 id. 463 ; *I. C. R. R. Co.* v. *Illinois*, 146 U. S. 387; *Shively* v. *Bowlby*, 152 id. 1 ; *Hardin* v. *Jordan*, 140 id. 371 ; *Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79 ; *Bedlow* v. *N. Y. F. D. D. Co.*, 112 id. 263 ; *B. M. Co.* v. *I. W. Co.*, 129 id. 155 ; *Gibbons* v. *Ogden*, 9 Wheat. 1 ; *Harmon* v. *City of Chicago*, 147 U. S. 396; *Smith* v. *Alabama*, 124 id. 465.) The act of 1868, so far as it attempted to authorize the grant of lands under water to this company, was void, as a violation of article 3, section 16 of the Constitution. (*Astor* v. *A. R.*

*Co.*, 113 N. Y. 93; *Johnson* v. *Spicer*, 107 id. 185; Cooley
Const. Lim. [6th ed.] 177; *People ex rel.* v. *Briggs*, 50 N.
Y. 553, 567; *In re Van Antwerp*, 56 id. 261, 267; *In re M.
G. L. Co.*, 85 id. 526; *Greenwood* v. *F. Co.*, 105 U. S. 13,
19; *Mumma* v. *P. Co.*, 8 Pet. 281, 286; *Fletcher* v. *Peck*,
6 Cranch, 135; *People* v. *O'Brien*, 111 N. Y. 1, 56.)   No
evidence was necessary to demonstrate the unconstitutionality
of the grant to the company, and, therefore, none was offered
except public documents of which the board might have taken
judicial notice.   The grant being statutory, it became a ques-
tion of construction, and the invalidity of the grant was and
is to be determined upon arguments deduced from the law
itself.   (*People ex rel.* v. *Durston*, 119 N. Y. 569; *B. M. Co.*
v. *B. S. I. Works*, 129 id. 155; *Bell* v. *Gough*, 23 N. J. L.
646; *D. College* v. *Woodward*, 4 Wheat. 578; *Mayor, etc.*,
v. *M. R. Co.*, 143 N. Y. 1, 26; *Santennis* v. *Ladew*, 140 id.
463; *In re Cooper*, 93 id. 507, 512; *Detmold* v. *Drake*, 46
id. 318, 325; *People* v. *Stephens*, 71 id. 527; *McMaster* v.
*State*, 108 id. 555; *U. S. Bank* v. *P. Bank*, 9 Wheat. 104.)
If this court determines that the Board of Claims was wrong,
it should not send the claim back there to be re-tried.   The
facts are undisputed, and this court ought, therefore, in the
furtherance of justice, to frame such a judgment as the facts
entitle the claimant to have, with instructions to the Board of
Claims to follow it.   (*Sayre* v. *State*, 123 N. Y. 291; *Riggs*
v. *Palmer*, 115 id. 506.)   The claim was properly before the
Board of Claims.   (*Cole* v. *State*, 102 N. Y. 48; *People* v.
*Denison*, 84 id. 272; *Lewis* v. *State*, 96 id. 71; *Rexford* v.
*State*, 105 id. 229; *Gates* v. *State*, 128 id. 221.)   The land
board had competent jurisdiction to dispose of the claim.
(*People* v. *Terry*, 108 N. Y. 1; *Mayor, etc.*, v. *Sands*,
105 id. 210, 218; *Wood* v. *Suprs.*, 136 id. 403, 411; *People*
v. *Eddy*, 57 Barb. 593; *Stief* v. *Hart*, 1 N. Y. 20;
*People* v. *Hicks*, 15 Barb. 153; *O'Hara* v. *State*, 112 N. Y.
146; *Parmenter* v. *State*, 135 id. 154.)   This claim was not
barred by any existing provision of law.   (*O'Hara* v. *State*,
112 N. Y. 146; *Corkings* v. *State*, 99 id. 491; *Evans* v.

*Cleveland*, 72 id. 486; *Greene* v. *Martine*, 21 Hun, 136; 84 N. Y. 648; *Holsman* v. *St. John*, 90 id. 461.) The doctrine of *laches* and acquiescence cannot be successfully invoked as a defense by the state. (*Pickard* v. *Sears*, 6 Ad. & El. 474; *N. Y. R. Co.* v. *Rothery*, 107 N. Y. 310; *Galway* v. *M. R. Co.*, 128 id. 132; *Fullwood* v. *Fullwood*, L. R. [9 Ch. Div.] 176; *Parmenter* v. *State*, 135 N. Y. 154.) The act creating a state board of audit worked no repeal of this act of 1875. (*In re Curser*, 89 N. Y. 401, 403; *Wood* v. *Suprs.*, 136 id. 403, 409; *Red Rock* v. *Henry*, 106 U. S. 601; *Mark* v. *State*, 97 N. Y. 572; *McKenna* v. *Edmundstone*, 91 id. 231; *Willy* v. *Mulledy*, 78 id. 310; *State* v. *Marlow*, 15 Ohio St. 134; *Rexford* v. *State*, 105 N. Y. 229; *Lewis* v. *State*, 96 id. 71.) Interest should be allowed as damages for the detention of this purchase money from claimant. (*Adams* v. *F. P. Bank*, 36 N. Y. 261; *McMahon* v. *N. Y. & E. R. R. Co.*, 20 id. 463, 469; *Robbins* v. *Carll*, 93 id. 656; *Mygatt* v. *Wilcox*, 45 id. 306, 310; *Ashhurst* v. *Field*, 28 N. J. Eq. 315; *People* v. *N. Y. County*, 5 Cow. 334; *King* v. *Diehl*, 9 S. & R. 408, 422; *Martin* v. *Silliman*, 53 N. Y. 615; *McMaster* v. *State*, 108 id. 542, 557; *De·Lavellette* v. *Wendt*, 75 id. 579, 582; *Winch* v. *M. B. I. Co.*, 86 id. 618; *Parmenter* v. *State*, 135 id. 154; *Cook* v. *Whipple*, 55 id. 150; *Wilson* v. *City of Troy*, 135 id. 103.)

*G. D. B. Hasbrouck* for respondent. The claim of the Marsh Land Company is barred by the six-year limitation. (Laws of 1875, chap. 257; *Corbett* v. *Bradley*, 4 Nev. 106; *Putnam* v. *Van Allen*, 46 Hun, 492; *People ex rel.* v. *Loomis*, 27 id. 328; *State* v. *Stout*, 7 Neb. 89; *Rose* v. *Governor*, 24 Tex. 496; *Raymond* v. *State*, 54 Minn. 562; *Josslyn* v. *Stone*, 28 Miss. 753; *Peck* v. *State*, 137 N. Y. 374; *Bank of Monroe* v. *State*, 26 Hun, 581; *Lewis* v. *State*, 96 N. Y. 71; *Rexford* v. *State*, 105 id. 229; *McDonald* v. *State*, 109 id. 73; *O'Hara* v. *State*, 112 id. 146; *Cayuga Nation* v. *State*, 99 id. 235.) The claimant was guilty of *laches* and has failed to prosecute its claim. (*In re Lord*, 78 N. Y. 111; *Duffy* v.

*Duffy*, 117 id. 647; *Coil* v. *Campbell*, 82 id. 509; *Lyon* v. *Park*, 111 id. 350; *In re Palmer*, 115 id. 493; *Calhoun* v. *Millard*, 121 id. 69, 82; Code Civ. Pro. § 822; *Ellsworth* v. *Brown*, 16 Hun, 1.)   No interest should be allowed. (*Redfield* v. *I. Co.*, 110 N. Y. 174; 140 id. 227; *Sayre* v. *State*, 123 id. 292; *McMaster* v. *State*, 109 id. 73.)

O'BRIEN, J.   The claimant, as receiver of a corporation known as the Marsh Land Company, sought to recover from the state the sum of $25,000, with interest from April 13, 1876.   On a trial before the Board of Claims it has been decided that this claim is not a valid one, and an award was accordingly made in favor of the state.   The most important question in the case is whether the claimant, or the corporation which he represents, ever had a just claim for the recovery of this sum, or any part of it, in law or equity.   This question depends upon the validity and effect of certain statutes enacted by the legislature.

The Marsh Land Company was incorporated by force of chapter 864 of the Laws of 1868, as amended by chapter 282 of the Laws of 1869.   Those statutes conferred powers, in addition to those usually possessed by corporations, of the most important and extensive character.   The act was entitled "An act to authorize the drainage of marsh lands."   After providing that certain persons named, and their successors, should become a corporation, with the usual powers, and providing for its government and management and the amount of its capital stock, it was enacted that the corporation should have power to re-claim and drain, from time to time, as should appear expedient, all or any portion of the wet or overflowed lands and tide-water marshes on or adjacent to Staten Island and Long Island, except such portions of the same as were included within the corporate limits of any city, and to construct, maintain and use all dykes, dams, ditches, drains, sluices, engines, pumps and other works necessary or convenient for that purpose.   Power was also given to enter

upon all lands and waters for the purpose of making surveys and locating the dykes and other works, and, when the same was determined upon, to deposit in the office of the secretary of state a map and survey of such route and locations, and then " to use and own the right and title of the state in and to all the lands under water that may lie within or between said dykes and the present shore line," upon the payment into the treasury of the state of such sum of money as should be determined, by a commission to be appointed by the governor, to be the fair value of such lands under water, belonging to the state. The corporation accepted the powers and fran- chises conferred by the act and complied with all of its pro- visions necessary in order to become vested with the title to the lands contemplated by the grant. It filed the maps and surveys locating the dykes and applied to the governor for the appointment of the commissioners to determine the amount to be paid to the state, and they reported to the secre- tary of state that they had valued the lands under water belonging to the state, included between the dykes and the established line of riparian owners, as shown by the maps, at $25,000.

The corporation paid this amount into the state treasury on the 16th of December, 1871, and received from the treasurer the certificate provided for by the act, which was recorded in the several counties in which the lands were situated. The boundaries of the lands under water thus granted were not defined in the act, but the corporation had power to locate the dykes at pleasure and indicate the location upon the map, and, thereupon, whatever lands were included between the dykes and the shore line vested in the corporation.

The act, if valid, thus empowered the corporation to become vested with the title to such portions of the land under the waters of the sea and the sound as it chose to designate upon the maps, within the limits of the counties of Kings, Queens, Richmond and Suffolk, except the city of Brooklyn, which was then the only incorporated city in those four counties. The full history of this legislation and the causes which led to

its enactment does not, of course, appear in the record, and it
is quite impossible to conjecture either from the language
of the act itself, or from any light that we now have, what real
purpose or what latent project was in view. All we know is,
that soon after it had been passed its full scope and effect was
seen, probably by some of the property owners on the shore,
and it became the subject of investigation by the legislature.
The judiciary committee of the senate, to whom the matter
had been referred, reported in regard to its passage and to its
effect upon the rights of the state and the owners of lands
upon the shore, and expressing in strong language a very
unfavorable opinion with respect to the validity and propriety
of the legislation. The matter was finally referred to the
attorney-general, who responded in an elaborate opinion, con-
taining views equally unfavorable, but declining to interfere
for reasons which he stated, and among them the fact that the
validity of the act could be tested in the courts by the private
parties whose property was affected.

It should also be observed that this statute, in addition to
the powers already referred to, authorized the corporation to
cause assessments to be made upon private property claimed
to be benefited, without any provision for notice to the owners,
and to exercise the right of eminent domain in such way as to
leave the sections conferring these powers open to very grave
objections. By chapter 257 of the Laws of 1875 the legislature
repealed all those sections of the act which conferred the
power to carry on its operations of draining and re-claiming,
and to acquire the title to the lands under water, or to levy
assessments, or exercise the power of eminent domain, together
with the amendatory act of 1869. This legislation did not in
terms extinguish the corporation, but it was completely shorn
of all its powers and franchises, and nothing was left but a
mere skeleton with corporate life. The title of this repealing
act, after referring to the provisions repealed, states that it was
also for the re-payment of moneys paid into the state treasury,
but the only direct provision on that subject which appears in
the body of the act, is one which empowered the commis-

sioners of the land office " to examine any claim for damages of said company founded on amounts actually expended and liabilities actually incurred under said act and to report thereon to the next legislature." This legislation evidently put an end to all the operations of the company. The officers and managers themselves seemed to have been appalled at the extravagant magnitude of the grant under the acts which had been repealed, as they made no question in the courts as to the right to recall it.

On the contrary, they acquiesced and accepted the provisions made for compensation by filing with the commissioners of the land office, on the 13th of April, 1876, a claim for upwards of $350,000, including the item of $25,000 in question. At a meeting of the commissioners, held about a month afterwards, the claim was laid upon the table, and no further action was ever after taken upon it by that body with a view to its adjustment or payment, although from time to time it was the subject of application to the legislature for relief. The subsequent history of the claim, however, belongs to another part of this discussion. What has thus far been stated is quite sufficient to enable us to get a clear view of the merits of the claim, so far as this item is concerned, as between the corporation and the state at the time when it was filed. The learned trial court has held that under the act of 1868 the company became vested with the title and ownership of the lands under water, outside the shore line of these four counties, as designated upon the maps; that the title thus acquired was not affected by the repealing act of 1875, and, still holding the title to the lands, the company or its representative has no claim against the state for the money paid into the treasury as the consideration for the grant. Of course, if the premises from which the reasoning of the court proceeded are accepted as correct, the conclusion is so obviously sound and just as scarcely to admit of any discussion. It is plain that the claimant ought to have either the money or the land, and if the validity of the grant could be confirmed by the judgment of this court, it would, doubtless, be of immensely more value

than any mere money claim involved. But we think that so far as the statutes referred to attempted to confer title to such a vast domain which the state held for the benefit of the public, they were absolutely void as in conflict with the Constitution of the state and of the United States. The objections to the legislation are many and grave, but I will not attempt to elaborate them all.

There is nothing in the enactments to indicate that the grant was for any public purpose and none has been suggested; and if it could be upheld, it is obvious that such a result would establish the principle that a majority in the legislature is competent to convey to a private corporation, for private purposes, the land under all the tide waters within the jurisdiction of the state. The nature of the title and the power of the sovereign to alienate lands under tide waters have been a prolific source of judicial discussion from the earliest times, and, judging from the numerous recent decisions, the subject is still almost as fresh as ever. This is due mainly to the circumstance that the courts have never yet attempted to fix the precise limits of legislative power in that regard. It is very difficult and perhaps wholly impracticable to do so. The courts have been satisfied to develop and apply principles, from time to time, sufficient for the purposes of the particular case. It is quite sufficient now to say that wherever the line may be drawn between grants of this character which the legislature may and may not make, such a grant as this has never yet been upheld. The question is governed in this state by the rules of the common law, modified in some respects by statute, and adapted by the courts to such changes of conditions as exist here. That the dominion and ownership of such lands is in the sovereign for the benefit of the public has long been settled. Such dominion and ownership of property generally implies the power of absolute disposition, but with respect to the land under navigable or tide waters an important limitation has been engrafted upon this power from the nature of the title. The title of the state to the seacoast and the shores of tidal rivers is different from the fee simple

which an individual holds to an estate in lands. It is not a proprietary, but a sovereign right, and it has been frequently said that a trust is engrafted upon this title for the benefit of the public of which the state is powerless to divest itself. (3 Kent. Com. 545 [9th ed.]; 3 Wash. Real Prop. 418 [4th ed.]; Gould Law of Waters, §§ 18, 44; Angell on Tide Waters, 158; *Smith* v. *Rochester*, 92 N. Y. 463; *Gann* v. *Free Fishers*, etc., 11 H. L. 192; *Illinois Central R. R.* v. *Illinois*, 146 U. S. 387; *Hardin* v. *Jordan*, 140 id. 371; *Shively* v. *Bowlby*, 152 id. 1; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 N. Y. 75.)

It would, no doubt, be difficult to reconcile all the numerous expressions of opinion to be found in the decisions on this question. In many of them general language is used which would seem to sanction the doctrine of absolute ownership and the unrestrained power of disposition by the sovereign, but this language must be read and understood with reference to the special facts of each case, and when thus read and interpreted, much of the apparent conflict disappears. It has often been said that the legislature of this state is clothed with all the powers of the British Parliament, except as restrained by the express or implied provisions of the Constitution. When the general doctrines of the English courts on this subject are given full scope, the conclusion is inevitable that the Parliament and the Crown together were not competent to grant to a private corporation, for private purposes, the seacoast around the island below the shore line, without violating established principles of law. (*Martin* v. *Waddell*, 16 Peters, 367.) While I am not aware of any such restriction to be found in the Constitution of this state, in terms, yet, from the very nature of the question, it must be deemed to be inherent in the title and power of disposition. The title which the state holds and the power of disposition is an incident and part of its sovereignty that cannot be surrendered, alienated or delegated, except for some public purpose, or some reasonable use which can fairly be said to be for the public benefit. (*Illinois Central R. R. Co.* v. *Illinois, supra; Shively* v. *Bowlby,*

*supra ; People ex rel. v. Squire,* 107 N. Y. 593 ; *Buffalo, etc.,
R. R. Case,* 111 id. 132, 140 ; *Hardin* v. *Jordan, supra.*)

Such a grant, therefore, can never constitute a contract
between the state and the grantee which is beyond the power
of revocation by a subsequent legislature.   For every purpose
which may be useful, convenient or necessary to the public,
the state has the unquestionable right to make grants in fee or
conditionally for the beneficial use of the grantee, or to pro-
mote commerce according to their terms.   The extensive grant
to the city of New York of the lands under water below the
shore line around Manhattan island clearly comes within this
principle, since it was a grant to a municipality, constituting a
political division of the state, for the promotion of the com-
mercial prosperity of the city, and consequently of the people
of the state. (*Langdon* v. *Mayor, etc.,* 93 N. Y. 129.)   So,
also, grants to railroads for rights of way and other facilities
for the transaction of their business, made under the authority
of the state, have been held valid upon the same principle
(*Saunders' Case, supra*), as well as to corporations and private
persons engaged in commerce or navigation for their necessary
or reasonable use.   Grants to the owners of the adjoining
uplands, either for beneficial enjoyment or for commercial
purposes, have long been authorized and recognized as one of
the uses to which the state may lawfully apply such lands.
But it was never supposed that the state could grant away any
of this portion of its domain for mere speculative purposes,
or that it could traffic in it like an individual who owned prop-
erty which he had the right to sell at such price and for such .
purposes as his immediate wants and interests seemed to
require.   It is quite conceivable, however, that such grants
have been made under such circumstances and for such pur-
poses that, when recalled or revoked, there may arise, in favor
of the grantee and against the state, an obligation to restore
the consideration paid, or to make good losses incurred in con-
sequence of improvements or expenditures upon the faith
of the grant, which the state is bound to discharge in honor
and good faith.

It may be that the provisions of the act, so far as they affected the rights of riparian owners, as well as those which authorized the imposition of assessments and the sale of private property in case of non-payment, and the exercise of the right of eminent domain for private purposes, constituting, as I think they did, unconstitutional invasions of private rights, must ordinarily be assailed by the parties affected, still they were reasons which justified the legislature in passing the repealing act.

The act, so far as it attempted to confer upon the company the right of property in the lands and the dominion over the waters designated on the maps, and the power to inclose such parts of the same as it elected to take with dykes and other obstructions to navigation, was obnoxious to that provision of the Federal Constitution which confers upon Congress the exclusive power to regulate foreign and inter-state commerce. (*Gibbons* v. *Ogden*, 9 Wheat. 1; *Harmon* v. *City of Chicago*, 147 U. S. 396; *Smith* v. *Alabama*, 124 id. 465.)

The statute must be viewed with reference to what could have been done under it and not what actually was done. (*Stuart* v. *Palmer*, 74 N. Y. 183, 188.) And when we consider that the locality where the operations of the company were to be carried on is the great highway of commerce which should be open and common to all, it is not difficult to see that such power, if upheld, might seriously interfere with the navigation upon the waters, and consequently with the freedom of commerce.

The act of 1868 was also violative of § 16, art. 3 of the Constitution, which provides that no local or private bill shall be passed embracing more than one subject, and that shall be expressed in the title. The bill was clearly both private and local. (*People* v. *O'Brien*, 38 N. Y. 193.) It created a private corporation, and its operations affected four counties in the state. The subjects embraced in it were the creation of the corporation; the authority to drain and re-claim tide-water marsh lands; to levy and collect assessments; to exercise the power of eminent domain and the grant of lands belonging

to the state. We have seen that the purpose of the act, as expressed in the title, was the authority to "drain marsh lands." Without inquiring whether any of these subjects are germane to, or so connected with the one expressed in the title as to escape the objection, it is quite clear that no citizen or member of the legislature would expect to find such an extraordinary grant from the state of lands under water in the body of a bill with such a title, and that is a fair test of the question. (*Astor* v. *Arcade R. Co.*, 113 N. Y. 93; *Johnston* v. *Spicer*, 107 id. 185; *Matter of Paul*, 94 id. 497; *Matter of Blodgett*, 89 id. 392; *Matter of Mayor, etc., N. Y.*, 99 id. 569.)

The various provisions of the act are so mingled together and dependent upon each other that it is not clear that any of them can stand, except, possibly, the sections creating and providing for the management of the corporation. It is not important to decide what provisions, if any, of the act can be upheld, since, even if the section creating the corporation should fall with the rest, it is undisputed that it organized, assumed and exercised corporate powers under an act of the legislature, and thus it was a corporation *de facto*, if not *de jure*, and it required the judgment of a competent court or an express act of the legislature to terminate its existence. The claimant, having been appointed receiver by the judgment of the court, has in any view a sufficient standing to enforce this claim. It follows that the legislation referred to was, for the reasons stated, wholly ineffectual to divest the state of its ownership of the lands under water or to vest any right or title to the same in the corporation, and, consequently, that the claim presented for re-payment to the corporation of the consideration money was just.

The remaining question is whether the claim is barred by § 14, art. 7 of the Constitution, which prohibits the audit and payment of any claim, which, as between citizens of the state, would be barred by lapse of time. It is not necessary to refer to the subsequent clauses of the section, because it has been

held that they apply only to claims existing at the time the section went into effect, on January 1, 1875, and such is evidently the correct meaning of the provision. (*O'Hara* v. *State*, 112 N. Y. 146.) The repealing act having been passed, and this claim having accrued subsequent to that date, the only question is whether, upon the facts found, it would have been barred as between private litigants.

Reference has already been made to the provisions of the repealing act which empowered the commissioners of the land office to examine the claim and report thereon, and to the filing of the claim. The power to audit the claim had then been taken from the legislature by a new provision of the Constitution (§ 19, art. 3), but it had still the power to create some tribunal for that purpose and to appropriate money for the payment of the award. (*Cole* v. *State*, 102 N. Y. 48, 52.) The legislature had the power to constitute the commissioners of the land office, composed of the state officers and the presiding officers of the senate and assembly, a tribunal for that purpose, and there is no reason to doubt that such was the intention. The power to examine the claim was broad enough to authorize the commissioners to take testimony as to the facts and determine the amount justly due so far as any tribunal of its own creation ever can determine that question as against the state. Having abrogated the grant, the obligation to make the grantee good for what had been taken from it was recognized, at least to the extent of the sum which the state had received as the consideration, and for the purpose of determining that question judicial powers were conferred upon the commissioners. (*People ex rel.* v. *Supervisors of Dutchess*, 9 Wend. 508; *People* v. *Hicks*, 15 Barb. 153; *Groenvelt* v. *Burwell*, 1 Salk. 200.)

The direction to report to the next legislature was not a limitation upon the power of the commissioners, but was merely directory. The jurisdiction to examine and report was not lost by failure to comply with the direction. The power conferred imposed a duty which rested upon them until performed. (*People* v. *Schermerhorn*, 19 Barb. 540, 558; *Mat-*

*ter of Broadway Widening*, 63 id. 572; *Rawson* v. *Van Riper*, 1 T. & C. 370.)

Nor was the power to examine and report thus conferred upon the commissioners repealed or in any way affected by the passage of chapter 444 of the Laws of 1876, creating the board of audit with power to hear and determine all private claims against the state. The latter was a general law applicable to all claims of a private nature against the state, except such as were then pending before the canal appraisers. The act of 1875, referring this claim to the commissioners, was special and applicable to a single claim only. There was no express repeal of the latter, and there is no such repugnancy in the terms or objects of the two statutes as to work a repeal by implication. Both statutes can stand, each answering all the purposes and performing all the functions which were intended. Power conferred by statute for a special purpose and applicable to a particular case is not taken away by the passage of a subsequent statute general in its language and in its scope and application.

The power is deemed to be repealed only when the language of the latter clearly discloses such an intention, or when the two enactments are so repugnant to each other that both cannot stand. (*Wood* v. *Supervisors*, 136 N. Y. 403; *Mark* v. *State*, 97 id. 572; *McKenna* v. *Edmunstone*, 91 id. 231; *Van Denburgh* v. *Village of Greenbush*, 66 id. 1; *People* v. *Quigg*, 59 id. 83.)

Thus it appears that within a year after the claim accrued it was presented to the tribunal constituted by the state to hear and examine into its merits. This was equivalent to the commencement of an action between citizens, which suspended the operation of the Statute of Limitations upon the claim, and unless something occurred afterwards to set the statute running the cause of action is not barred.

The next step in the history of the claim was an application by one of the creditors of the corporation to the legislature for relief and the passage of chapter 317 of the Laws of 1884.

This act recited the preceding legislation in regard to the

company; the repeal of the grant; the payment of the $25,000 which still remained in the treasury; the reference of the claim to the commissioners of the land office; the failure to report; the fact that one Collins held judgments against the company amounting to $9,033.39, recovered before the passage of the repealing act, and then appropriated money for the satisfaction of the judgments.

This was, doubtless, as the court below remarked, a singular piece of legislation. But, while it diminished to the extent of the sum paid by the state to this creditor, the claim of the company, it certainly did not prejudice it in any other respect. On the contrary, it was a recognition in a very solemn form of the obligations of the state and the justice of the claim.

Application to the legislature for payment of the balance, or some disposition of the matter, followed during the subsequent years. In 1892 the commissioners of the land office referred the matter to the attorney-general, who expressed the opinion that the claim had been transferred by operation of law to the Board of Claims. How it got there we are not informed, since the opinion of the learned attorney-general is not in the record. His view probably was that it came there through the board of audit and the operation of the act (Chap. 205, Laws of 1883) creating the Board of Claims. If so that question has already been considered. But in any view it is difficult to see that the transfer of an action from one tribunal to another by force of a statute could have any effect upon the operation of the Statute of Limitations. The commissioners of the land office, however, by resolution in April, 1892, transferred the claim to the Board of Claims, and, in January following, the present claimant amended the claim by an abandonment of all of it, as originally filed, except the item of $25,000, subject to reduction by the application of the sum paid upon the judgment in 1884. Subsequently all the other items of the claim were dismissed by the board, with the consent of the claimant, without prejudice to the item retained. In February, 1893, the case was moved for trial before the board, and, upon an expression of opinion by the

court, which implied great doubt as to its jurisdiction, the trial was suspended, though the claim was not dismissed. By chapter 425 of the Laws of 1893 the claims pending before the commissioners of the land office were transferred to the Board of Claims. We think that the claim was, at the time of the passage of the act, pending before the commissioners of the land office, and that enactment transferred the case to the Board of Claims, and conferred jurisdiction upon that court to hear and determine it. The question of *laches*, as before observed, has no application to claims arising subsequent to January, 1875, nor to any cause of action between citizens after the commencement of the action. The claim, therefore, was not barred by the Statute of Limitations.

All the other items having been withdrawn, and expressly abandoned by the claimant through his counsel in open court and dismissed at his request, must be regarded as finally disposed of by a judgment in favor of the state. There is not, I think, any good ground for refusing interest on the sum which the state received. It is true that prior to the amendment of the claim in 1893 this item was part of a large claim which was unliquidated. But the sum of money paid into the treasury was always a liquidated demand. There is no rule of law that I am aware of which suspends the running of interest upon such a demand merely because it is united with other claims not liquidated. For all purposes this item must now be treated in the same way as if no other claims had been made or as if it had been filed separately. These views lead to the conclusion that the claimant is entitled to recover the $25,000, with interest from April 13, 1876, after crediting upon the claim the amount paid under the appropriation of 1884. If the company aliened or incumbered any of the lands for a consideration, that fact should be considered in diminution of the claim. The trial court has found that it had not, prior to the passage of the repealing act. I am not prepared to say that it was impossible for the company, if it continued to exist, to receive some benefit afterwards upon the faith of a colorable title. While it is not likely that it did,

still the state ought not to be concluded, but the question should be left open for such investigation as the attorney-general may consider necessary.

The award of the Board of Claims should be reversed and a new trial granted, costs to abide the event.

All concur, except HAIGHT, J., not sitting.

Award reversed.