SQUAW ISLAND FREIGHT TERMINAL COMPANY, INC., Appellant, *v.* CITY OF BUFFALO, Respondent.

Fourth Department, January 15, 1936.

*Desbecker, Fisk, Newcomb & Deckop* [*James A. Deckop, Adrian Block* and *John F. Huber, Jr.*, of counsel], for the appellant.

*Gregory U. Harmon, Corporation Counsel* [*Frank C. Westphal, Assistant Corporation Counsel*, of counsel], for the respondent.

LEWIS, J. This appeal is from a judgment dismissing the complaint on the merits in an action by which the plaintiff seeks to enjoin the city of Buffalo from discharging sewage into the Niagara river in a manner which invades the property rights of the plaintiff as a lower riparian owner. Demand is also made for property damages alleged to have resulted from pollution.

The Niagara river bounds the city of Buffalo on the west at which point it flows due north with a current velocity varying from four to eight miles an hour. Close to the river's east bank and within the city limits is Squaw island, the major portion of which was purchased by the plaintiff in 1916. The island is irregular in shape and comprises seventy-five acres of upland; it has a river frontage of more than 3,000 feet along its westerly side and a maximum width of about 1,300 feet. In 1926 the plaintiff added to its holdings by purchasing from the State thirty acres of land under water which lies adjacent to the westerly and southwesterly shores of the island.

The plaintiff's licensee has recovered from lands thus acquired by plaintiff more than 2,000,000 cubic yards of sand and gravel by means of hydraulic dredging. This method involves the use of boats equipped with hydraulic pumps operated in connection with a long, flexible hose at the end of which is an adjustable hood. The equipment is so arranged and powered that when the hood rests upon the river bottom it pumps a mixture of nine parts water and one part sand and gravel, which is discharged into a scow where the water is drained away, leaving the solid matter for transportation. At times, when the dredging occurred close to the island's shore, the uplands — losing support — would fall into the river as the hood burrowed into the land under water, thus causing the

shore line to recede at those points and increasing the area of plaintiff's lands under water.

In 1883, under authority granted by chapter 341 of the Laws of 1882, the city of Buffalo constructed what is known as the Swan street sewer which discharged into Niagara river at a point near Albany street, which was then approximately 4,000 feet directly south of and upstream from Squaw island. Since the completion of this sewer it has been in continuous use and has become one of the city's principal means of sewage disposal.

The extent of its discharge may be understood from the fact that into this sewer — which has a diameter of eight feet — passes in a raw, untreated state the domestic sewage, trade wastes and storm waters from an area which comprises more than 8,000 acres, including the downtown or business section of Buffalo. Within that area it affords sewage disposal for a population in excess of 200,000. In dry weather the quantity of discharge is from seventy-five to ninety cubic feet per second, which more than doubles under storm conditions.

The plaintiff does not complain of pollution between the years 1883 and 1925. It bases its right to relief upon a condition which did not develop until 1925. Prior to that time, for a period of more than forty years, the Swan street sewer had discharged into the river through an opening in a loose masonry wall known as the Bird island pier which at that time formed the easterly shore of the river and extended downstream northerly toward Squaw island. In 1918, as an incident to the construction of a new concrete wall opposite the original sewer outlet and fifty feet west of Bird island pier, the sewer was extended northwesterly to connect with a new outlet and thereafter discharged directly into the river through an opening in the new wall at an angle of forty-five degrees pointed downstream. Then followed the extension northerly of a new perpendicular shore wall from the location of the sewer outlet downstream toward Squaw island.

It is important to note that although this wall was designed to form a new east shore, it did not parallel the course of the old walled shore line but took a direction gradually to the west into the river. The result was that in 1925, when the new wall had been constructed for a distance of about 1,700 feet north of the sewer outlet, its downstream end, which was then approximately 2,200 feet from the uplands of Squaw island, was 300 feet out in the stream or west from the old shore line. The new wall had thus narrowed the river to the extent of 300 feet and, according to the plaintiff's claim, had formed a bay of slack water to the east and north of the end of the wall which extended back to the former east shore line and northerly to the south end of Squaw island.

The plaintiff contends that in the fall of 1925 the sewage which was discharged from the Swan street sewer was carried by the river's current northerly along the outside of the new wall; that upon reaching the outmost point of the new masonry it turned easterly around the wall's end, followed the eastward eddy created there and was carried back into the bay of slack water which proved to be a settling basin; that the sewage which had been held in suspension was then deposited in sufficient quantities upon the shores of Squaw island and upon plaintiff's lands under water adjacent thereto to destroy the commercial value of a quantity of sand and gravel owned by the plaintiff.

Upon that branch of the case the city claims that there was no appreciable amount of sewage deposited upon the plaintiff's lands and that, in any event, it was not exclusively the sewage from the Swan street sewer. Upon that subject the trial court has found as a fact, upon plaintiff's request, that, from 1900 until the summer of 1925, the sand and gravel upon plaintiff's lands under water at Squaw island was " clean, marketable, * * * unspoiled and unpolluted by sewage, trade wastes or other filth; " that " the first traces of sewage and filth found in the sand and gravel dredged from lands under water *owned by plaintiff* * * * appeared in the summer of 1925 and that thereafter the sewage and pollution found in the sand and gravel so dredged continued to increase until May, 1927, when the destruction of all sand and gravel deposits on the said lands became complete." As to the source of the pollution the trial court has also found that " the greater part of the sewage came from the Swan Street sewer."

The judgment, which dismisses the complaint upon the merits, rests upon the finding that the pollution of which complaint is made was due to plaintiff's own acts; that the method of dredging adopted by the plaintiff caused the shore line of Squaw island to recede at various points and at the southerly end of the island formed an artificial bay of such depth as to interfere with the river's current at that point and along the westerly shore and to cause the sewage-laden waters flowing downstream to be drawn into the quiet waters of the bay and along the shore where it settled with the resulting damage to plaintiff's lands.

We do not determine the question whether the weight of evidence favors the findings of the trial court as to a causal connection between the plaintiff's acts and the damage of which it complains for, if it is assumed that there is proof sufficient to support those particular findings, we do not regard them as sufficient in law to support the judgment of dismissal. Likewise we are not in agreement with the trial court's conclusion that as the Swan street sewer discharges

into Niagara river under legislative authority, the city has not invaded property rights of the plaintiff.

The Niagara river is a navigable stream of fresh water which forms an international boundary. Although the State has surrendered to Congress, under the commerce clause of the Federal Constitution (Art. 1, § 8, subd. 3), the power to supervise and regulate those conditions which affect navigation and promote international and interstate commerce (*Shively* v. *Bowlby*, 152 U. S. 1, 48; *United States* v. *Chandler-Dunbar Waterpower Co.*, 229 id. 53, 62, 63. Cf. " New York and Its Waters," by William S. Andrews, Cornell Law Review, vol. XVI, pp. 1, 6, 9), the title to the bed of the river to the international boundary line is in the State of New York. (*Massachusetts* v. *New York*, 271 U. S. 65, 89, 90; *Shively* v. *Bowlby*, *supra*, p. 43.) The State's title is not proprietary but is that of a sovereign and is held as such for the benefit of all its people. (*Coxe* v. *State*, 144 N. Y. 396, 406; *Smith* v. *City of Rochester*, 92 id. 463, 477, 478; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, 144 id. 75, 85; *Matter of City of New York*, 168 id. 134, 144. Cf. *Little Falls Fibre Co.* v. *Ford & Son, Inc.*, 249 id. 495, concurring opinion by ANDREWS, J., at p. 504.)

As to the title to the waters themselves which flow within the Niagara river, all interest therein is nothing more than an easement, incapable of fixed appropriation or conversion. " Neither sovereign nor subject can have any greater than a usufructuary right therein, and even this is subject to the temporary enjoyment by the riparian proprietors over whose lands it passes while on its way to its final destination, undiverted and undiminished, save for domestic or manufacturing purposes." (*Smith* v. *City of Rochester*, *supra*, 480, 484.)

Thus recognizing the State's title to the bed of the stream and the common easements to which its waters are subjected, we pass to a consideration of the rights of the two parties to this action — each of whom is a riparian owner.

We believe it to be the settled law of this jurisdiction that the ownership by the State, as sovereign, of the bed of the river is not accompanied by a loss by the riparian owner of his common-law riparian rights. (*Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79, 87, 88; *Saunders* v. *N. Y. C. & H. R. R. R. Co.*, *supra*, 87, 89; *Hedges* v. *West Shore R. R. Co.*, 150 N. Y. 150, 158, 159; *Thousand Island Steamboat Co.* v. *Visger*, 179 id. 206, 210; *Town of Brookhaven* v. *Smith*, 188 id. 74, 81, 82. Cf. *Yates* v. *Milwaukee*, 10 Wall. 497, 504.) As the owner of Squaw island, located downstream from the outlet of the Swan street sewer, the plaintiff is a lower riparian owner; its " right to the use of the water of [Niagara river] a flowing

stream, navigable * * *, arises by mere operation of law as incident to the ownership of the bank and is a part of the estate of its owner." ( *United Paper Board Co.* v. *Iroquois Pulp & Paper Co.,* 226 N. Y. 38, 46; *People ex rel. Niagara Falls Power Co.* v. *Smith,* 70 App. Div. 543, 546; affd., 175 N. Y. 469. Cf. Gould Waters [3d ed.], pp. 393–404.)

As such riparian owner, the plaintiff has the legal right to use its own property as it chooses and to put to account the property's commercial value by a method of dredging or otherwise, subject to any Federal or State regulations for the protection of navigation and commerce and to its own legal duty to lower riparian owners. In making such legal use of its own property the plaintiff is likewise entitled to assert its common-law riparian rights against their impairment through pollution or otherwise by an upper riparian owner. Those common-law riparian rights, as defined by Judge VANN in *Strobel* v. *Kerr Salt Co.* (164 N. Y. 303), entitle the plaintiff (p. 320) " to a reasonable use of the water flowing by [its] premises in a natural stream, as an incident to [its] ownership of the soil, and to have it transmitted to [it] without sensible alteration in quality or unreasonable diminution in quantity. While [it] does not own the running water, [it] has the right to a reasonable use of it as it passes by [its] land. As all other owners upon the same stream have the same right, the right of no one is absolute, but is qualified by the right of the others to have the stream substantially preserved in its natural size, flow and purity, and to protection against material diversion or pollution. This is the common right of all, which must not be interfered with by any. The use by each must, therefore, be consistent with the rights of the others, and the maxium of *sic utere tuo* observed by all." (Cf. Gould Waters [3d ed.], §§ 219–222.)

Despite the fact that common-law riparian rights, as thus defined, were an incident to and vested in plaintiff's ownership, it has been found by the trier of the facts in the case at bar that, beginning in the late summer of 1925, waters reached Squaw Island which were sewage-laden to such an extent that in May, 1927, " the destruction of all sand and gravel deposits on the said lands [owned by the plaintiff] became complete." It has also been found that the " greater part " of this pollution was the effluent from the Swan street sewer.

We thus reach the question whether the plaintiff is entitled to assert its common-law riparian rights against the city of Buffalo, an upper riparian owner, which is responsible, in part at least, for such pollution. It does not avail the city as a defense that other upper riparian owners may have contributed to the pollution.

(*Strobel* v. *Kerr Salt Co.*, *supra*, p. 322; *Weeks-Thorn Paper Co.* v. *Glenside Woolen Mills*, 64 Misc. 205, 207; affd., 140 App. Div. 878; affd., 204 N. Y. 563; *Butler* v. *Village of White Plains*, 59 App. Div. 30, 35.)

The argument of the defense proceeds upon the theory that as the State owns the bed of the Niagara river it had the power to authorize the act of which the plaintiff now complains and that the statutory authority thus given affords immunity to the city for the damages, if any, inflicted upon the plaintiff's property. With that argument we cannot agree.

An examination of the statute upon which the respondent relies (Laws of 1882, chap. 341) discloses that, in so far as it grants any rights in the waters of Niagara river, it goes no further than to authorize the city " to construct a trunk sewer from a point in Niagara river, north of the water-works and south of Albany street, to a junction with the Mill Race sewer." Neither the Niagara river nor the use of its waters in any manner is again mentioned by the statute. We recognize the implication that, having given the right to construct a sewer from a point " *in* " the river, the Legislature intended, as a natural consequence that sewage could be discharged at that point. We do not find, however, that the statute grants more than *permission* to discharge sewage into the river. The grant of that permission confers no license to use it in disregard of the property rights of a lower riparian owner; nor does it give immunity for the invasion of those rights. The statute being permissive makes applicable the rule announced in *Hill* v. *Managers of Metropolitan Asylum District* (L. R. [4 Q. B. Div.] 433; L. R. [6 App. Cas.] 193, 213): " Where the terms of the statute are not imperative, but permissive, when it is left to the discretion of the persons empowered to determine whether the general powers committed to them shall be put into execution or not, * * * the fair inference is that the Legislature intended that discretion to be exercised in strict conformity with private rights, and did not intend to confer license to commit nuisance in any place which might be selected for the purpose." (Cited with approval in *Bohan* v. *Port Jervis Gas Light Co.*, 122 N. Y. 18, 28.)

There is another rule by which the statute under consideration must be tested to determine its availability as a defense to this action: " The statutory authority which will justify an injury to private property and afford immunity for acts which would otherwise be a nuisance must be express, or must be a clear and unquestionable implication from powers expressly conferred, and it must appear that the Legislature contemplated the doing of the very act which occasioned the injury." (*Bohan* v. *Port Jervis Gas Light*

*Co., supra,* p. 27. See, also, *Cogswell* v. *N. Y., N. H. & H. R. R. Co.,* 103 N. Y. 10, 21; *Sammons* v. *City of Gloversville,* 175 id. 346, 352; *Baltimore & Potomac R. R. Co.* v. *Fifth Baptist Church,* 108 U. S. 317, 331; *Butler* v. *Village of White Plains, supra,* p. 36.) An apt discussion of this rule is found in *Hill* v. *Mayor, etc., of New York* (139 N. Y. 495, 502): " The authority [statute] which will thus shelter an actual nuisance must be express, or a clear and unquestionable implication from powers conferred, should be certain and unambiguous, and such as to show that the Legislature must have contemplated the doing of the very act in question. For, consider what the proposition is. It upholds a positive damage to the citizen and denies him any remedy; it infringes his normal and recognized rights with absolute impunity; it sets a nuisance at his door utterly unbearable and requires him to bear it. Surely, an authority which so results should be remarkably strong and clear. In *U. S.* v. *Fisher* (2 Cranch, 390), Chief Justice MARSHALL said, ' Where rights are infringed, where fundamental principles are overthrown, where the general system of the laws is departed from, the legislative intention must be expressed with irresistible clearness to suppose a design to effect such objects.' "

Viewed in the light of these rules we believe that the statute which authorized the city to discharge its sewage into Niagara river is not sufficient in law to afford immunity for the impairment of plaintiff's rights as a lower riparian owner.

The city also asserts as a defense the fact that the Federal government, in the exercise of its control over navigation, may stop the dredging operations by which the plaintiff's licensee has recovered sand and gravel from plaintiff's lands under water and which have been heretofore conducted under Federal permits. We have seen that plaintiff's riparian rights are charged with and subject to the public easement in the river waters for the purposes of navigation and to any Federal and State regulations in that regard. Such regulations, however, cannot afford the city a complete defense to this action although they may become material upon the question of alleged damages.

In determining the form of relief to be applied in this case we are not unmindful that the disposal by a great city of the refuse of human habitation and industry is a vital municipal function; it involves great expense and is closely related to public health. It should not be accomplished, however, in violation of the rights of private property without just compensation being made for their invasion. It has been said that the courts " will not change the law relating to the ownership and use of property in order to accommodate a great business enterprise." (*Strobel* v. *Kerr Salt Co.,*

*supra*, p. 322.) The same rule has been applied where the disposal of municipal sewage was involved. (*Luther* v. *Village of Batavia*, 169 App. Div. 71, 72.)

We conclude that the city is not immune from liability for damage caused to plaintiff's property and if the cause remains a continuing source of damage to the plaintiff it should be removed. To deny the plaintiff either injunctive relief or damages under circumstances disclosed by the record would put the hardship on the party in whose favor the legal right exists instead of on the wrongdoer. "Although the damage to the plaintiff may be slight as compared with the defendant's expense of abating the condition, that is not a good reason for refusing an injunction." (*Whalen* v. *Union Bag & Paper Co.*, 208 N. Y. 1, 5.) Nor should our determination be influenced by a balancing of injuries. (5 Pom. Eq. Juris. [2d ed.] § 1945.)

An important municipal function is being performed by a method which involves polluting the waters of a navigable river in which both parties have rights in common. Under the course of authority already outlined, which we regard as controlling, we cannot permit plaintiff's property damage to go unrequited. " The necessities of one man's business cannot be the standard of another's rights in a thing which belongs to both." (*Wheatley* v. *Chrisman*, 24 Penn. St. 298, 302.)

The judgment from which appeal is taken should be reversed on the law and facts, with costs; the case should be remitted to the Supreme Court at Special Term for the purpose of determining the amount of damages, if any, to which the plaintiff is entitled; an injunction should issue restraining the city from disposing of its sewage into the Niagara river in such a manner as will invade the legal rights of the plaintiff as a lower riparian owner. Such injunction should not issue, however, until the Special Term, after such hearing as may be deemed necessary, shall determine a means adequate to avoid the pollution of which plaintiff complains and the reasonable time required by the city to put such means into effect. The effective date of the injunction should be fixed accordingly and upon such further terms and conditions as in the discretion of the trial court will best preserve the legal rights of the parties hereto.

All concur. Present — SEARS, P. J., TAYLOR, EDGCOMB, THOMPSON and LEWIS, JJ.

Judgment reversed on the law and facts and interlocutory judgment granted, with costs, and matter remitted to the Special Term for further proceedings in accordance with the opinion. Certain findings of fact and conclusions of law disapproved and reversed.