(No. 11237.—Decree affirmed.)

THE STATE OF ILLINOIS, Appellant, *vs.* HARRY S. NEW
*et al.* Appellees.

*Opinion filed October 23, 1917.*

1. WATERS—*fact that a lake is not meandered when surveyed is not conclusive that it is not navigable—burden of proof.* In a proceeding where the State claims title to an inland lake on the ground that it is navigable, the fact that the lake was not meandered when surveyed is not conclusive that it was not navigable, but the burden is on the State to establish by proof that the lake was navigable for useful commerce in a state of nature, before it was affected by artificial changes.

2. SAME—*when State has title to inland lake in trust for the people.* If at the time the State was admitted into the Union an inland lake in the State was navigable for useful commerce and furnished a highway over which commerce was or might have been carried on in the customary modes in which commerce was then conducted by water, the title to the bed of the lake is vested in the State in trust for all the people of the State.

3. SAME—*determination by land department of Federal government that lands are swamp lands cannot be attacked collaterally.* The determination of the Federal government, by the Secretary of the Interior, as head of the land department, that lands in a State are swamp and overflowed lands, is the determination of a question of fact by a tribunal specially authorized to determine such fact and is conclusive except in a direct attack for fraud or mistake.

4. APPEALS AND ERRORS—*when question cannot be presented to the Supreme Court although motion was made before the master.* Where a motion is made before the master to exclude certain counsel from participation in a case on certain alleged grounds but the master permits such counsel to continue in the hearing without ruling on the motion and the motion is not in any way presented to the court for a ruling, the question raised by the motion cannot be presented on appeal to the Supreme Court.

APPEAL from the Circuit Court of Fulton county; the Hon. HARRY M. WAGGONER, Judge, presiding.

EDWARD J. BRUNDAGE, Attorney General, and JAMES H. WILKERSON, (HIRAM T. GILBERT, JOHN C. SLADE, and GERALD G. BARRY, of counsel,) for appellant.

LYMAN LACEY, JR., ALEXANDER C. AYRES, B. M. CHIP-
ERFIELD, and C. E. CHIPERFIELD, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is an appeal from a decree of the circuit court of
Fulton county dismissing for want of equity a bill filed by
appellant and granting the prayer of a cross-bill filed by ap-
pellees. This litigation involves the title to what is known
as Thompson lake, a body of water in Fulton county some
three and one-half miles in length, one-half to one mile
wide and of varying depth, in sections 27, 28, 32, 33 and 34
in township 5, and sections 4, 5, 8, 9 and 17 in township 4,
north, range 4, east of the fourth principal meridian, in
said county, lying parallel to and about one-half mile west
of the Illinois river, and being connected with said river
at both the north and south ends of said lake by channels
hereinafter described. The original bill filed July 1, 1915,
described the lake, and alleged the lake and the channels
connecting it with the river were navigable and had been
for many years; that the same had been used by the pub-
lic generally for fishing until within the past few years,
when defendants, and those under whom they claim title,
had endeavored to exercise exclusive possession, and that
the defendants had on June 7, 1915, filed a petition in the
county court of Fulton county for the organization of a
drainage and levee district embodying the lands of Thomp-
son lake. The bill sought to enjoin the organization of
such district or any act which interfered with the free and
unobstructed use of the lake or its connecting channels for
fishing or navigation or from asserting any claim or title to
the bed of the lake or its channels, and prayed that the
boundaries of the lake be defined and fixed and the lake
declared navigable and the title thereto declared to be in
the State in trust for all the people thereof.

Two separate answers were filed by the different de-
fendants, denying said lake and the channels connecting it

with the Illinois river were navigable in a state of nature and averring they were only navigable in times of high and flood waters. Certain of defendants admitted they claimed the ownership and exclusive right to and possession of the lands described in the complainant's bill and admitted they sought to organize said lands into a drainage and levee district. Defendants averred the size and depth of said lake had been greatly increased during the past few years by the building of the LaGrange dam in the Illinois river below Thompson lake in 1890, turning into the Illinois river in 1900 the waters of the Sanitary District of Chicago and by other drainage improvements along the upper part of the Illinois river. Defendants aver the bed of said lake was in a state of nature swamp and overflowed land and so recognized by the Federal government, which by an act of Congress in 1850 granted these lands to the State as swamp and overflowed lands, that they might be reclaimed; that the then Governor of Illinois had the lands granted to it as swamp and overflowed lands by the Federal government investigated and decided the lands in controversy were swamp and overflowed lands, and that the Federal government in 1857, pursuant to an act of Congress, issued patents to the State of Illinois for the lands in question. The State of Illinois subsequently conveyed said lands to Fulton county, and defendants claim title to the lands through deeds from said county to either themselves or their predecessors in title. The answers aver that title to said lands has been quieted in defendants or their grantors in the circuit court of Fulton county, and that the State of Illinois has never intervened nor claimed title, and ought not now, after some sixty years of acquiescence, be permitted to claim an interest in the lands. The answers aver the Illinois river is a navigable stream, but that said Thompson lake, lying one-half mile west of the same, is not a channel of the Illinois river, and is not and never has been a navigable body of water, as that term is commonly known and

understood.  Defendants also filed a cross-bill setting up the same facts recited in their answers, and asking that a decree be entered declaring cross-complainants to be the owners in fee simple of the property involved, and that an injunction issue perpetually enjoining complainant, the State of Illinois, its officers or agents, from asserting any right, title or interest in or to the property or from instituting any proceeding against cross-complainants or their grantees.

No answer was filed to the cross-bill, and after a rule was entered upon the cross-defendant to plead to the cross-bill, and it having failed to do so by a day named, cross-defendant was defaulted and on motion the cross-bill was taken as confessed.

The cause was referred to a special master in chancery to take the proof and report the same, together with his conclusions as to law and fact.  On the hearing before the master complainant moved that certain counsel representing some of the defendants be excluded from further participating in the hearing because of their alleged inconsistent relation to or connection with former proceedings concerning the property here involved.

The master reported that the building of the LaGrange dam in 1890 and the opening of the Sanitary District of Chicago in 1900 permanently raised the water in Thompson lake, and the channels connecting it with the Illinois river, not less than three feet at low water; that Thompson Lake slough, connecting the north end of the lake with the river, was not navigable in fact prior to 1890, and that Cut road, connecting the south end of the lake with the river, is an artificial channel which was not navigable in a state of nature.  The master found that neither Thompson lake nor Thompson Lake slough was ever meandered by any government survey; that the taxes on all the lands involved had for seven years last past been paid by defendants or their grantors; that the lands involved were conveyed by the Federal government to the State of Illinois,

and by the State of Illinois to Fulton county, as swamp and overflowed lands, which county conveyed said lands to defendants or their predecessors in title. The master further found the lake was not navigable for travel or commerce prior to 1850; that the State of Illinois had treated these lands as private property for more than sixty years; that said lake had not been free and open to the public for navigation, fishing and hunting, but that defendants and their predecessors in title had claimed the exclusive right, title and use thereof. The master's conclusions of law, based upon said findings of fact, were that the Interior Department of the United States had jurisdiction to determine what were swamp and overflowed lands, and that its finding that the lands here involved were such was conclusive and not subject to collateral attack; that the patents issued by the United States government to the State of Illinois were valid conveyances, and that the State of Illinois in the sale of said lands and the receipt of taxes thereon for more than fifty years is estopped to assert any title to the lands involved; that Thompson lake, Thompson Lake slough and Cut road are not navigable; that the equities were in favor of the defendants to the original bill, and recommended a decree be entered dismissing the original bill for want of equity and entering a decree as prayed in the cross-bill.

After the filing of said report the complainant moved to have the default entered to the cross-bill set aside. This motion was denied, and the complainant filed exceptions to the master's report, which were overruled and a decree entered dismissing the original bill for want of equity and granting the relief prayed in the cross-bill, from which decree this appeal has been perfected.

Several errors are assigned, the principal ones argued and relied upon being the court's action in ruling complainant to answer the cross-bill by a day named and entering an order of default and taking the cross-bill as confessed, and in dismissing the original bill and granting the relief

prayed in the cross-bill. Other questions involved and argued are, can a cross-bill be maintained against the State of Illinois, and can complainant collaterally attack the decision of the Federal government finding the lands here involved swamp and overflowed lands.

The prayer of the original bill that defendants be enjoined from organizing the lands into a drainage district or from claiming any right, title or interest in or to the lands was not granted, nor was the prayer that the title to the lands be found to be in complainant. The decree finds the title to the lands was not in complainant but in defendants. If that is correct, it would follow the other relief prayed in the original bill was rightly denied. If the title was in defendants, they might, so far as complainant is here concerned, organize the lands into a drainage district, and, we think, defendants were entitled to have the free enjoyment of their property, unmolested by complainant, its officers or agents. That is what was asked in the cross-bill, but, whether the filing of the cross-bill making the State a party defendant was proper or not, the State was not injured or prejudiced by the decree granting the relief prayed in the cross-bill if the State had no interest in the lands. The principal question determined, and the one upon which the rights of the parties depended, was the ownership of the lands described in the original bill. Out of this question arose the other issues here involved and decided.

Besides oral testimony of more than one hundred witnesses heard by the master, maps and plats of surveys and many other exhibits, such as gauge readings of the height of the water in the Illinois river at various places and soundings and levels of the water in the lake and in the slough and Cut road, were introduced. We shall not undertake to summarize all the testimony but will state in a general way what in our judgment it proved and our conclusion from it.

There were four surveys made of Thompson lake or
parts of it. The first survey, made in 1817, did not, as we
understand it, include that part of the lake in township 4
nor the whole of that part lying in township 5. The field
notes indicate the stage of water interfered with a more
complete survey. The next survey, made in 1827, appears
to have been made in connection with the survey of a
meander line down the Illinois river, and only some lines
of land covered by Thompson lake were run. Apparently
much of the land was under water to such an extent that it
was only partially surveyed. Another survey was made in
1842, at a time when the lake was frozen over, and stakes
were driven in holes cut through the ice marking lines
and corners. In 1902-04 a survey was made of the Illinois
river valley, including Thompson lake, by a board of United
States engineers, pursuant to an act of Congress. In none
of these surveys was the lake, or the slough connecting it
with the river, meandered, nor were they, or either of them,
referred to as navigable. That fact is not necessarily con-
clusive that the lake was not navigable, but the burden was
on complainant to establish by the proof that it was, in
fact, navigable for useful commerce in a state of nature
and before it was affected by artificial changes. The proof
of the actual condition of the lake does not go further back
than a period between 1850 and 1860. It was then in a
state of nature, and if navigable at that time we might be
justified in assuming that it was navigable before that and
at the time the State of Illinois was admitted into the Un-
ion. If at that time the lake was navigable for useful com-
merce and furnished a highway over which commerce was
or might have been carried on in the customary modes in
which commerce was then conducted by water, the title to
the bed of the lake passed to and vested in the State of Illi-
nois in trust for all the people of the State. (*Wilton* v.
*VanHessen,* 249 Ill. 182, and cases there cited.) Unless
the State acquired title in that way it had no title to the

bed of the lake. Some increase in the stage of the water
in the river opposite the lake was caused by the construc-
tion of the LaGrange dam below there, in 1890, but it is
not clear how much the water was raised by that dam. In
1900 the waters of the Sanitary District of Chicago were
turned into the Illinois river and caused a permanent rise
in the water level of the river of from three to four feet.
There was also proof introduced by appellees for the pur-
pose of showing that other causes had contributed to raise
the water level in the river. Prior to the excavation of
the Cut road, between 1890 and 1898, the only way water
from the river could get into the lake, except when the river
overflowed its banks, was through Thompson Lake slough.

The zero on the gauge at Havana, which city is on the
river and opposite the south end of the lake, was 431.67
feet above Memphis datum. The elevation of the surface
of the water at that point is ascertained by adding the num-
ber of feet recorded on the gauge at any given time to the
zero. The bottom of Thompson Lake slough was some-
what higher than the bottom of the lake and much higher
than the bottom of the river. There were periods in most
if not all years prior to the raising of the water level in
the river by artificial means when the slough in places
had little or no water in it. Teams hauling loaded wagons
crossed it and persons crossed it on foot. A civil engineer
called on behalf of appellees testified he had surveyed and
taken levels in the slough, and that the elevation of the bot-
tom for about 300 feet of it was 438, which would require
a stage of water at Havana of 6.7 feet above zero before
any water would be on this part of the bottom of the
slough, or a stage of 9.7 feet at Havana before a boat
drawing three feet of water could navigate that part of the
slough. The same witness testified he had counted the num-
ber of days in each year, from 1877 to 1897, inclusive, ex-
cept the year 1879, that the water stood below 437, and
that the lowest number of days in any one of these years

was 33 and the highest number 302. In many of the years the water was lower than 437 substantially half, or more than half, of the time. It is evident from the proof, consisting in part of the testimony of men who had lived in the vicinity of the lake and slough many years, that the engineer's testimony was substantially correct if not strictly accurate. Certainly the slough was not proven to be navigable for useful commerce in a state of nature, and there would be little ground for claiming the lake itself was navigable in a state of nature for useful commerce in the customary modes in which commerce was conducted by water, in the absence of a navigable inlet and outlet between the lake and the river.

The limits of the territory covered by water in times of high water and at an ordinary stage of water varied greatly. Witnesses testified that inside the timber line hay was cut, cattle pastured and some corn raised prior to the increase in the water level of the river subsequent to 1890. At an ordinary stage of water prior to 1890 it is claimed the depth of the lake was from three to five feet, and at those times its width was approximately one-half mile and its length approximately four miles. Witnesses testified they had waded it at different times. Its only natural connection with the river is Thompson Lake slough, at the upper or north end, variously estimated at from 40 to 100 feet wide and one-half mile long. The land, from one-half to three-quarters of a mile in width, lying between the lake and the river was covered with timber such as ordinarily grows on bottom land subject to periodical overflow. A passageway near the south end, 40 or 50 feet wide, was cut through the timber from the lake to the river, probably between 1850 and 1860, for use when the water was high. At an ordinary stage of water this passage was dry land. Some time in 1890 or 1898,—it is not clear what year,—a dredge-boat was taken through this Cut road, making a channel through which boats passed in and out of the lake.

280 — 26

It is apparent from the testimony that the Cut road channel, prior to 1900, afforded no connection between the lake and the river except in times of high water and that in a state of nature there was no channel there. The only water connection between the lake and the river at that place, prior to cutting the channel with the dredge-boat, was when the river overflowed the land between it and the lake. Appellant proved that a number of boats, some of them propelled by steam power, had passed from the river into the lake and brought out loads of lumber, wood, grain, fish, etc. They sometimes used the slough as a passageway and sometimes the Cut road, which to our minds makes it evident that the boating was done in times of high water, for, as we understand the proof, it is clear that at an ordinary stage of water in the river these passageways could not be navigated. There were no elevators, warehouses, wharfs or docks built on the shore of the lake, and from the location of some of the places where it was testified boats were loaded it is certain the water must have been much higher at the time than the ordinary stage, or boats could not have reached them.

Without further adverting to the voluminous testimony, and not overlooking appellant's testimony tending to show that in the process of time the lake has grown shallower from sediment washed into it by the waters coming in from the surrounding territory, we are satisfied the State failed to prove as a fact that the lake in a state of nature was navigable for useful commerce. *Joliet and Chicago Railroad Co.* v. *Healy,* 94 Ill. 416; *Schulte* v. *Warren,* 218 id. 108; *People* v. *Economy Light and Power Co.* 241 id. 290.

By act of Congress in 1850 the swamp and overflowed lands in various States, including Illinois, remaining unsold on September 28, 1850, were granted to the States to enable the several States to construct the necessary levees and drains to reclaim said swamp and overflowed lands. The lands here in controversy had not at that time been sold

by the Federal government. The act of Congress made it the duty of the Secretary of the Interior to make accurate lists and plats of all such lands and transmit the same to the Governors of the several States, and at the request of the Governor of any State to cause patents to be issued to such State for said swamp and overflowed lands. By act of Congress it was provided that all lands selected and reported to the general land office as swamp and overflowed lands by the several States entitled to the provisions of the act prior to March 3, 1857, were confirmed in the States, respectively, so far as they remained vacant and unappropriated by actual settlement under any law of the United States. The commissioner of the Federal land department wrote the then Governor of Illinois requesting him to have the county surveyors or other reputable persons make statements, under oath, of the swamp or overflowed lands in their respective counties. At the request of Gov. French, then Governor of Illinois, D. F. Emry, county surveyor of Fulton county, made a list of swamp and overflowed lands. The bed of Thompson lake was described in said list. The legislature of Illinois, by act of June 22, 1852, granted to the respective counties in which the same might lie, all the swamp and overflowed lands granted to the State by act of Congress. Pursuant to that act the State Auditor filed a list of the swamp and overflowed lands with the county clerk of Fulton county, which included the bed of Thompson lake. Patents for the lands in controversy pursuant to the act of Congress were issued to the State of Illinois and by the State of Illinois to Fulton county. Fulton county sold the lands to appellees or their predecessors in title.

The investigation and determination of the swamp and overflowed lands in the various States were committed to the land department of the Interior Department of the Federal government. That department was authorized to investigate and determine what lands were swamp and overflowed as distinguished from lands covered by navigable

water. The determination of the Federal government by the Secretary of the Interior, as head of the land department, that the lands were swamp and overflowed lands was the determination of a question of fact by a tribunal specially authorized and empowered to determine such fact and is conclusive except in a direct attack for fraud or mistake. It cannot be attacked collaterally, as attempted in this case.

In *Bristol* v. *Carroll County,* 95 Ill. 84, appellee claimed title to certain lands originally granted by the Federal government under authority of the Swamp Land act of 1850. Appellant insisted that for the appellee to establish title in itself it was necessary to show such lands were, in fact, swamp lands. This court said: "It was not necessary * * * to show that the lands were, in fact, swamp and overflowed lands. It was enough that they were found included in the list of swamp and overflowed lands which the commissioner of the general land office transmitted to the Governor as such. The act of Congress conferred upon the Secretary of the Interior the power of determining what lands were of the description granted by that act, and the decision of his office on that subject is controlling."

*French* v. *Fyan,* 93 U. S. 169, was an action in ejectment. The defendant claimed title by *mesne* conveyances under a patent from the United States government to the State of Missouri under the Swamp Land act of 1850. The opinion states the single question raised was the refusal of the court to receive oral testimony to impeach the validity of the patent from the United States to the State of Missouri, issued under the Swamp Land act of 1850, for the purpose of showing such lands were not, in point of fact, swamp lands. The court held the Swamp Land act of 1850 made it the duty of the Secretary of the Interior to identify such lands, make lists thereof and cause patents to be issued therefor, and that a patent so issued could not be impeached by showing that the lands it conveyed were not, in fact, swamp and overflowed lands.

In *Burfenning* v. *Chicago, St. Paul, Minneapolis and Omaha Railway Co.* 63 U. S. 321, it was said: "It has undoubtedly been affirmed, over and over again, that in the administration of the public land system of the United States questions of fact are for the consideration and judgment of the land department and that its judgment thereon is final. Whether, for instance, a certain tract is swamp land or not, saline land or not, mineral land or not, presents a question of fact not resting on record, dependent on oral testimony, and it cannot be doubted that the decision of the land department one way or the other, in reference to these questions, is conclusive and not open to relitigation in the courts, except in those cases of fraud, etc., which permit any determination to be re-examined." See, also, *Fuller* v. *Shedd,* 161 Ill. 462.

It is not, as we understand counsel for appellant, denied that this is the law, but it is claimed that it is not applicable here, for the reason Thompson lake in a state of nature and at the time of the admission of Illinois into the Union was a navigable body of water and the title to its bed passed to and vested in the State, so that in 1850 the Interior Department had no jurisdiction over said land and lake, and on that ground the action in determining it was swamp and overflowed land and disposing of it as such was subject to attack collaterally. As in our opinion the proof did not establish that Thompson lake in a state of nature was navigable for useful commerce, it necessarily follows the Interior Department did have jurisdiction to determine whether the land was included in the grant by the Federal government to the State of swamp and overflowed land. Its decision, therefore, was not subject to collateral attack under the authorities.

Complaint is made by appellant some of appellees' counsel were not excluded from participation in the hearing of this case, and it is claimed the decree should be reversed on that ground. The basis of this objection is that certain

of counsel for appellees had, as is claimed, in prior litigation involving the title to Thompson lake, represented parties who claimed and sought to establish that the lake was navigable and that title to its bed was held in trust by the State. A motion was made before the master to whom the case had been referred to exclude said counsel from further participation in the case on that ground. The master did not rule on the motion and counsel were permitted to continue in the hearing. The motion was never made before or in any way presented to the court for a ruling, and the question cannot now be presented to this court.

Other questions are raised and discussed in the briefs of counsel, but in view of the conclusion we have reached it is not necessary to discuss them.

The decree is affirmed.                                 *Decree affirmed.*

---

(No. 11483.—Reversed and remanded.)
MARY ALICE RAVENSCROFT, Appellee, *vs.* CATHERINE STULL *et al.* Appellants.

*Opinion filed October 23, 1917.*