HAWTHORNE, Justice
(dissenting).
If one will examine a map of the State of Louisiana, he will find off the southeast coast of the Parish of Plaquemines an arm of the sea bearing the name of Grand Bay. In this bay there were located at the time this suit was tried eight producing oil wells. The ownership of the accumulated oil royalty from these wells, amounting to many thousands of dollars, has provoked this concursus proceeding, instituted by The California Company. The claimants are the State of Louisiana on one side and a large group of individuals on the other who derive their title from one John Beckwith.
Grand Bay is conceded to be, and in fact it is, a navigable arm of the sea and was found by this court on original hearing to be such when the State of Louisiana was admitted into the Union in 1812. In 1874 a patent was issued to John Beckwith that covers and includes that portion of Grand Bay in which the eight producing wells are located. The individuals who derive their *753 title from Beckwith claim that he acquired title to that portion of Grand Bay under .and by virtue of this patent, as against the .State which contends that this patent insofar as it may apply to Grand Bay is null .and void, and which claims title by virtue ■of its inherent sovereignty.

The case therefore presents for determination the question: Is Grand Bay, a navigable arm of the sea, susceptible of private ownership?

If the answer to this question is in the affirmative, the bed of the Mississippi Riv•er, Lake Pontchartrain, the Port of New ■Orleans, and even portions of the Gulf of Mexico itself, owned by the State in 1812 by virtue of its sovereignty, are likewise susceptible of private ownership, provided the State, prior to the Constitution of 1921, issued through error, mistake, or otherwise z patent thereto.[1]
The State argues in the alternative that, if Grand Bay is susceptible of private ownership, the lands on which the producing wells are located are owned by it by virtue of an adjudication to the State in 1883 for the unpaid taxes for the years 1881 and 1882 under an assessment in the name of John Beckwith. For 63 years no assessment. was made of the property and no taxes were paid thereon, and the possession was in the State and the property was under the control and supervision of the State for all that time. It was not until 1946, 63 years after the adjudication, that Isaac R. Price acting for the Beckwith group executed an affidavit to the Register of the State Land Office and secured the cancellation of the tax adjudication. The State contends that the purported cancellation of the tax adjudication was null and void, and that consequently under the tax adjudication made to it in 1883 the title remains in the State. The Beckwith group, however, argue that the tax adjudication was void for want of definite description. If Grand Bay, a navigable arm of the sea, is susceptible of private ownership, there would seem to be considerable merit in the State’s alternative plea. However, in my opinion the bed of Grand Bay is insusceptible of private ownership, and consequently there is no reason for discussing this alternative plea.
Ever since Louisiana has been a state of the Union, it has been a rule of public policy and of title that the State of Louisiana as a sovereign holds title at all times to navigable arms of the sea, as they are insusceptible of private ownership. More *755 over, private ownership of a navigable arm of the sea is expressly prohibited by the articles of the Civil Code. Article 482 provides:
“Art. 482. Among those [things] which are not susceptible of ownership, there are some which can never become the object of it; as things in common, of which all men have the enjoyment and use.
“There are things, on the contrary, which, though naturally susceptible of ownership, may lose this quality in consequence of their being applied to some public purpose, incompatible with private ownership; but which resume this quality as soon as they cease to be applied to that purpose; such as the high roads, streets and public places.”
Articles 450, 451, and 453 read:
“Art. 450. Things, which are common, are those the ownership of which belongs to nobody in particular, and which all men may freely use, conformably with the use for which nature has intended them; such as air, running water, the sea and its shores.” (All italics mine.)
“Art. 451. Sea shore is that space of land, over which the waters of the sea spread in the highest water, during the winter season.”
“Art. 453. Public things are those, the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation: of this kind are navigable rivers, seaports, road-steads and harbors, highways and the beds of rivers, as long as the same are covered with water.
“Hence it follows that every man has a right freely to fish in the rivers, ports, roadsteads, and harbors.”
These articles, which were a recognition of principles fundamental in the civil law, were first found in our law in the Civil Code of 1808 and were carried forward into the Civil Codes of 1825 and 1870, and particularly establish the public policy of this State, and no principles could be more deeply embedded in our law. They are clear and permit of no construction other than that common and public things, while dedicated to public use, are for the use of all of the people and can be owned by no one. These articles have been uniformly construed in the furispmdence of this State, and among the cases holding that a navigable arm of the Gulf, such as that with which we are here dealing, is a common thing owned by the State in its sovereign capacity and insusceptible of private ownership are Milne v. Girodeau, 12 La. 324; Zeller v. Southern Yacht Club, 34 La.Ann. 837; Burns v. Crescent Gun & Rod Club, 116 La. 1038, 41 So. 249; Louisiana Navigation Co., Ltd. v. Oyster Commission of Louisiana, 125 La. 740, 51 So. 706; State v. Bayou Johnson Oyster Co., 130 La. 604, 58 So. 405.
In Louisiana Navigation Co. v. Oyster Commission, supra, plaintiff was asserting title under a patent issued by the State *757 to certain submerged lands which formed part of the bed of Mississippi Sound and the Gulf of Mexico, and particularly the bed of Creole Pass and Grand Pass off the coast of St. Bernard Parish. In dismissing the suit on exception of no cause of action this court, after quoting Article 453 of the Civil Code, said [125 La. 740, 51 So. 711]:
“Hence, there can be no such thing in this state as private ownership of the bed of a navigable river, and a fortiori can there be no such thing as private ownership of the bed of the sea or of an arm of the sea. In a case decided many years ago, this court (referring to certain land lying beneath the waters of Lake Ponchartrain and claimed by the plaintiff) said: ‘It appears to us that the testimony shows fully the ground in question lies much below high-water mark and forms part of the bed of the lake [arm of the sea], and is not, therefore, susceptible to private ownership.’ Milne v. Girodeau, 12 La. [324] 325. And, to the same effect, was the decision in Zeller v. Yacht Club, 34 La.Ann. 837. * * *"
The court further said:
“We conclude, then, that the grants under which plaintiff claims — being of land bordering upon, and partially surrounded by, the tide water of the Gulf of Mexico— carry its titles no farther than high-water mark, and that, in so far as it (plaintiff) asserts ownership and possession, under such titles, of land lying beneath the waters which surround the tracts of dry land included in said grants, or, lying beneath any navigable passes, or channels, which intersect such tracts or separate them from each other, the exception, of no cause of action, was properly maintained. * * * ”
In the famous case of Miami Corporation v. State, 186 La. 784, 173 So. 315, 322, the State was claiming title to a portion of the bed of Grand Lake in Cameron Parish by virtue of its inherent right of sovereignty and contending that it was not susceptible of private ownership. In that case the court had occasion to consider Articles 450 'and 453 of the Civil Code and cited numerous cases in our jurisprudence interpreting and applying these two articles. In the course of the opinion the court said:
“ * * * It appears to be the rule that where the forces of nature — subsidence and erosion — have operated on the banks of a navigable body of water, regardless of whether it be a body of fresh water or the sea, or ain arm of the sea, the submerged area becomes a portion of the bed and is insusceptible of private ownership. This is of necessity the law, because, to hold otherwise would be contrary to sound principles and public policy upon which the rule is predicated. It is the rule of property and of title in this State, and also a rule of public policy that the State, as a sovereignty, holds title to the beds of navigable bodies of water.”
In the Miami Corporation case the court overruled the decision in State v. Erwin, *759 173 La. 507, 138 So. 84, 91. In the Erwin case this court was dealing with the title to a portion .of the bed under the waters of Calcasieu Lake, and held it to be susceptible of private ownership. In overruling that holding the court in the Miami case quoted with approval from Comment, 7 Tulane Law Review 438, in which it was said that the Erwin case set a dangerous precedent contrary to the whole spirit of the Code which forbids private'ownership of the beds of navigable waters, and that the case was entirely out of line with the existing Louisiana jurisprudence on the subject, and that, since it was clearly bad policy to allow private ownership of the bed of navigable waters of any kind, it was submitted that the conclusion reached by the court in the Erwin case would produce undesirable results. However, even the Erwin case recognized that an arm or part of the sea is not susceptible of private ownership, for on rehearing in that case this court said that “ * * * the rehearing was granted * * * in order to reconsider the question whether Calcasieu Lake is an arm or part of the sea”. The court then said:
“If in fact it is [an arm or part of the sea], the lands involved are not susceptible of private ownership; they belong to nobody in particular; they fall into the class of public things, ‘the property of which is vested in a whole nation, and the use of which is allowed to all the members of the nation.’ Civ.Code, arts. 450, 453.”
Of course prior to 1921 there was no-constitutional prohibition against the Legislature’s disposing of the lands and property which the State held for the use of all of the people, but, as far as I can ascertain,, to this day there has never been an act of the Legislature authorizing the sale or transfer of the bed of an arm of the sea or Gulf or expressing any change in this policy against such alienation. On the contrary, in line with the public policy of the State the Legislature on numerous occasions has passed statutes expressly prohibiting the alienation of an arm of the sea, and they demonstrate beyond any question the public policy of this State that the bed of an arm of the sea is not susceptible of private ownership. See Act No. 106 of 1886, Act No. 110 of 1892, Act No. 121 of 1896, Act No. 153 of 1902, Act No. 52 of 1904, Act No. 189 of 1910, Act No. 54 of 1914, Act No. 139 of 1924, and Act No. 67 of 1932.
For instance, both in the 1910 and in the 1914 acts it was provided in Section 1 that all beds and bottoms of bays, sounds, and inlets bordering on or connected with the Gulf of Mexico and that part of the Gulf of Mexico within the jurisdiction of the State of Louisiana shall be, continue, and remain the property of the State of Louisiana. These acts provided that no grant, sale, or conveyance of land forming the bottoms of said bodies of water “shall hereafter be made by the Register of the *761 Land Office,” and, further, in Section 2 of both acts it was provided “That the rights of the owners or occupants of land on the shores of any of the waters herein-above described shall extend to the ordinary low water mark only, and no one shall own in fee simple any bottoms or lands enumerated in Section 1”.
The provisions of these acts are mentioned and quoted hereinabove only for the purpose of showing what the public policy of this State has been with reference to private ownership of property of the kind with which we are here dealing.
In 1874, at the time the patent was issued to John Beckwith, it is beyond question that there was no statute or law of this State authorizing the State or any agency or officer thereof to transfer or otherwise alienate the bed to an arm of the sea, title to which was in the State by virtue of its sovereignty. The patent to John Beckwith when issued in 1874, insofar as it included the bed of Grand Bay, a navigable arm of the sea insusceptible of private ownership, was therefore null and void as it was issued in contravention of the established policy of the State, in contravention of the articles of the Civil Code, and in contravention of the existing jurisprudence interpreting these articles, which we have cited herein-above.
The next question for consideration, then, is: Did Act No. 62 of 1912 have the effect of making valid the invalid patent that had been issued to Beckwith in 1874, or did this act ratify and confirm the invalid patent?
The patent describes the property conveyed according to governmental subdivisions, that is, by lots, sections, townships, and ranges, and it does not show on its face that a navigable arm of the sea, Grand Bay, was included in the property described therein.
Act No. 62 of 1912 provides that all suits or proceedings to vacate and annul any patent issued by the State of Louisiana, duly signed by the Governor of the State and the Register of the State Land Office and of record in the State Land Office, or any transfer of any property by any subdivision of the State shall be brought within six years of the issuance of the patent, provided that suits to annul patents 'previously issued (of which this suit is one) shall be brought within six years from the passage of the act.
As I have heretofore pointed out, in 1912 when this statute was adopted private ownership of an arm of the sea was contrary to the articles of the Civil Code and the long established public policy of the State. Consequently this statute, which the Beckwith group claim had the effect of ratifying and confirming their void patent, is to be strictly construed against the grantee named in the patent; for, as was announced in the case of State v. Bayou Johnson Oyster Co., 130 La. 604, 58 So. 405, 410:
*763 “It may be, and probably is, true that there is no legal inpediment in the way of the state’s alienating such property [an arm of the sea] in favor of particular individuals or corporations, save in so far as such alienations might conflict with the power vested in Congress to regulate interstate and foreign commerce; but, as we have already seen, her declared policy has always been not to do so, and any statute or ■contract from which such effect were claimed would, necessarily, be strictly construed against the grantee.”
To construe strictly against the grantee any statute from which alienation by the State of navigable waters is claimed is the legitimate and proper rule of construction which, contrary to the majority opinion, does no violence to Article 13 of the Civil Code. This rule is universally recognized and by its use even the common-law states have protected the beds of navigable bodies of water from claims of private ownership, even though those states may not have expressed in their statutory law recognition of the fundamental principles that appear in our Civil Code. In those states it is recognized that the state holds title to these navigable bodies of water in its sovereign, as distinguished from its proprietary, capacity in trust for the use of all the people. Pike Rapids Power Co. v. Minneapolis, St. P. & S. S. M. R. Co., 8 Cir., 99 F.2d 902; Holland v. Fort Pierce Financing & Const. Co., 157 Fla. 649, 27 So.2d 76; Miller v. Lewiston-Clarkston Canning Co., 35 Idaho 669, 209 P. 194; State v. New, 280 Ill. 393, 117 N.E. 597; Nelson v. De Long, 213 Minn. 425, 7 N.W.2d 342; State v. Longyear Holding Co., 224 Minn. 451, 29 N.W.2d 657; Squaw Island Freight Terminal Co., Inc., v. City of Buffalo, 246 App.Div. 472, 284 N.Y.S. 598; State v. Cleveland & P. R. Co., 94 Ohio St. 61, 113 N.E. 677, 679, L.R.A.1917A, 1007; Hazen v. Perkins, 92 Vt. 414, 105 A. 249, 23 A.L.R. 748; Breese v. Wagner, 187 Wis. 109, 203 N.W. 764. This public trust prohibits the alienation of such title by the state except to the extent that the public interest may require, and that alienation cannot be made which is inconsistent with that public trust. New York, N. H. & H. R. Co. v. Armstrong, 92 Conn. 349, 102 A. 791; Caples v. Taliaferro, 144 Fla. 1, 197 So. 861; Holland v. Fort Pierce Financing & Const. Co., supra; State v. Longyear Holding Co., supra; Frazee Milling Co. v. State, 122 Misc. 545, 204 N.Y.S. 645; James River & Kanawha Power Co. v. Old Dominion Iron & Steel Corporation, 138 Va. 461, 122 S.E. 344. Any alienation or grant of the title to navigable waters by the legislature must be express and specific and is never implied or presumed from general language in a grant or statute. U. S. v. Groen, D.C., 72 F.Supp. 713; Smoot Sand & Gravel Corp. v. Columbia Granite & Dredging Corporation, 146 Md. 384, 126 A. 91; City of New York v. Brooklyn Borough Gas Co., 201 Misc. 672, 105 N.Y.S. 2d 459; State v. Bradford, 121 Tex. 515, 40 S.W.2d 1065; Diversion Lake Club v. *765 Heath, Tex.Civ.App., 58 S.W.2d 566; Heard v. Town of Refugio, 129 Tex. 349, 103 S.W.2d 728; Lorino v. Crawford Packing Co., 142 Tex. 51, 175 S.W.2d 410; Grayhurg Oil Co. v. Giles, 143 Tex. 497, 186 S.W.2d 680. The majority opinion does not cite a single authority to the effect that it is a legitimate rule of statutory construction to interpret from general language of a legislature that it intended to change the public policy of the state and to part with title to the beds of navigable waters.
The 1912 act contains only a general repealing clause, and this repealing clause does not expressly alter or modify Articles 450, 451, 453, and 482 and other codal articles which declare an arm of the sea insusceptible of private ownership, nor is there any indication whatsoever that it was the purpose of the statute to change the existing public policy of the State that such an arm of the sea was not susceptible of private ownership.
To construe the statute as contended for by the Beckwith group, this act ratified and confirmed the patent to John Beckwith which was void when issued in 1874, and we should have to ignore and disregard the Code articles and the public policy of this State which had been in force for 100 years at the time the act was adopted.
This public policy that arms of the sea are not susceptible of private ownership, and the principles that the State owns them in its sovereign capacity and that all men have the right in common to use them are so fundamental that they would apply at all times and all places until the Legislature expresses an intention to change that policy and those principles. It is generally recognized that an interpretation of a statute is favored which is consistent with public policy, that derogation of common right and derogation of the State’s sovereignty are never to be implied in a statute, and that repeals of laws by implication are nev-. er favored. 3 Sutherland, Statutory Construction (Horack’s 3d ed.), sec. 5901, p. 125, sec. 6206, p. 180, sec. 6301, p. 183; Crawford, Statutory Construction, sec. 244, p. 477, sec. 246, p. 481.
The court here, instead of construing the statute strictly against the grantee, has violated all these rules of statutory construction and has construed the 1912 statute in a manner completely inconsistent with the public policy of this State and in complete disregard of it, has found by general language and by .implication only that the State intended to divest itself of arms of the sea that it held in its sovereign capacity for all the people, and to divest the people of their common right to use that arm of the sea and to vest ownership in an individual. As the act of 1912 is applied here, the principle of insusceptibility of private ownership and the Code articles are nullified by the passage of six years from the issuance of a patent which included an arm of the *767 sea. This interpretation has the same serious effect as a repeal of these articles of the Code by implication.
One principle of law which is well settled in our jurisprudence is that repeals by implication are not favored and will not be indulged if there is any other reasonable construction. In State v. Randall, 219 La. 578, 53 So.2d 689, 690, this rule was stated thus:
“Admittedly the statute does not expressly repeal the mentioned codal provisions; hence, the question is whether or not it repeals them by implication. In determining this question we must keep in mind those well established principles of law, reiterated in State v. Standard Oil Co. of Louisiana, 188 La. 978, 178 So. 601, 626, < * * * “repeals by implication are not favored and will not be indulged if there is any other reasonable construction; ***”*** £ilat prior laws are repealed by subsequent laws only in case of positive enactment or clear repugnancy * * *; that nothing short of irreconcilable conflict between two statutes works a repeal by implication * * *; * * * ’ ”. See also Chappuis v. Reggie, 222 La. 35, 62 So.2d 92; Wenk v. Anisman, 211 La. 641, 30 So.2d 567.
If the Legislature by the enactment of Act No. 62 of 1912 had intended to repudiate the articles of the Code and make such a serious change in the existing public policy of the State, it would have expressed that intention; and, as was said in Board of Com’rs of Tensas Basin Levee Dist. v. Hardtner, 164 La. 632, 114 So. 494, 500, “ * * * it is not at all likely that the repeal or revocation would have been left to implication instead of being made in unmistakable terms * * * ”.
As I have previously pointed out, the jurisprudence up to the passage of Act No. 62 of 1912 was uniform in holding that the bed or bottom of a navigable arm of the Gulf was insusceptible of private ownership (Milne v. Girodeau; Zeller v. Southern Yacht Club; Burns v. Crescent Gun & Rod Club; Louisiana Navigation Co. v. Oyster Commission, and State v. Bayou Johnson Oyster Co., all cited supra), and as further evidence of the public policy of the State various acts of the Legislature had expressly prohibited the alienation of such arm of the sea (Acts Nos. 106 of 1886, 110 of 1892, 121 of 1896, 153 of 1902, 52 of 1904, and 189 of 1910). If the 1912 act intended to nullify the articles of the Code and change the existing public policy, it is indeed strange and passing all understanding why in 1914 the Legislature unqualifiedly reaffirmed that public policy by saying in Act 54 that the beds and bottoms of bays bordering on or connected with the Gulf shall continue and remain the property of the State of Louisiana, and no one shall own in fee simple any such bottoms or lands. See also Act No. 139 of 1924, Act No. 67 of 1932.
It is my view that the Legislature by enacting the statute of 1912 never intended *769 to limit at any time or prevent in any way, even by implication, the application of the articles of the Code or to change the strong public policy of this State to the effect that an arm of the sea is not susceptible of private ownership, and I am convinced that, had the Legislature intended to do so, it would have said so in unmistakable terms and not have left its intention to mere implication from general language only. Any valid construction of the act of 1912 does not and cannot have the effect of confirming and validating the patent and vesting in a private individual or individuals title to property which is not susceptible of private ownership under the express terms of our Civil Code and the public policy of the State. Any other interpretation of the statute, I am convinced, will lead to absurd consequences.
In my opinion the purpose and intent of the Legislature in enacting the statute was not to nullify the Code articles and to change the public policy and the existing jurisprudence, but to ratify and confirm any patent which had been theretofore issued which conveyed or purported to convey public lands susceptible of private ownership which it was ordinary or usual for the State to convey, and not a patent which conveyed a navigable arm of the sea such as Grand Bay.
In an effort to mitigate somewhat their unreasonable and unsound contention that the 1912 statute had the effect of making Grand Bay susceptible of private ownership, the Beckwith group concede that their ownership of the bed of Grand Bay is subject to public rights of commerce, navigation, and fisheries. If this bay is susceptible of private ownership, however, that ownership under Civil Code Article 505 “carries with it the ownership of all that is directly above and under it.” The statute of 1912 contains no restriction on its effect of validating defects in patents warranting this concession. The patent itself contains no reservation, but is an outright grant and a conveyance of title from the State to John Beckwith.
This concession is completely revealing of the weakness of the Beckwiths’ position, and they were compelled to make it because the fundamental soundness of the principle that arms of the sea are not susceptible of private ownership would not reasonably permit a contention to be maintained that the Legislature intended by implication to permit them to be privately owned. What other consideration could have compelled them to make such a concession? If the Beckwith group can own this property privately under a patent from the State, their ownership would not be burdened with a legal servitude in favor of the public. The servitudes imposed by law are found in Book II, Title IV, Chapter 3, of our Civil Code, and nowhere therein is such a servitude imposed upon navigable waters or an arm of the sea. No such servitude was imposed for the reason that the bed of an arm of the sea under the *771 provisions of the Code is insusceptible of private ownership. The public has the right of use because ownership is in the State in its sovereign capacity, and giving such a right to the public by imposing a servitude on private ownership is inconceivable under this principle.
This concession of the Beckwith group appears to be an attempt to reduce the enormity of the act of reducing to private ownership a thing owned by the public as a whole by volunteering a kind of servitude in favor of the public. They would at this time permit the public all the uses to which the bay is subject except that of reducing the minerals under it to possession, thus retaining the exclusive right to lease for minerals. What is there in the law to prevent them from withdrawing a part or all of this concession? What if it should become profitable to them in the future to grant exclusive oyster or other fishing rights? What legal defense would the State have against such action if the 1912 statute cured all the defects of this patent and foreclosed any attack on it as a valid patent from the State? By this concession the Beckwith group would create for themselves a hybrid kind of ownership — private for the purpose of extracting the minerals, public for all other purposes — , an ownership unknown both to the statutory law and the jurisprudence of this State and not founded in reason or logic.
Let us now consider the jurisprudence of this State in those cases which are relied on by the Beckwith group and which have held that Act No. 62 of 1912 had the effect of ratifying and confirming patents issued which were subject to annullment where the State failed to institute suit timely. These cases are: Atchafalaya Land Co. v. F. B. Williams Cypress Co., 146 La. 1047, 84 So. 351; State v. Sweet Lake Land & Oil Co., 164 La. 240, 113 So. 833; Realty Operators, Inc. v. State Mineral Board, 202 La. 398, 12 So.2d 198; O’Brien v. State Mineral Board, 209 La. 266, 24 So.2d 470; Humble Oil & Refining Co. v. State Mineral Board, 223 La. 47, 64 So.2d 839.
Before the holding in any of these cases is discussed, it should be pointed out that in not one of them was the court dealing with an arm of the sea such as Grand Bay, nor in any of these cases did the court consider or discuss the question of whether the property by its nature was insusceptible of private ownership, or that private ownership was expressly prohibited by the articles of the Code and the public policy of the State.
In the Atchafalaya Land Co. case, supra, the court held that Act No. 62 of 1912 made valid a patent issued to lands which were granted and included in the act creating the Atchafalaya Basin Levee District but which had never been transferred pursuant to the act to the district. That case under the facts presented therein was cor *773 rectly decided, but in that case no arm of the sea or other navigable body of water was involved.
In State v. Sweet Lake Land & Oil Co., supra, the title to the bed of Sweet Lake was at issue. In that case the court found as a fact that the patents issued did not include lands within the tidewaters of the sea and that Sweet Lake was a shallow inland lake with no natural inlet or outlet and “ * * * was never useful or available for navigation or commerce, or of any more importance to the public at any time in the memory of man than it is to-day”. [164 La. 240, 113 So. 836.] In other words, the court found as a fact that Sweet Lake was not navigable in law or in fact, stating: “We agree with the district judge that there is no proof nor reason to believe that Sweet Lake was a navigable body of water in 1812, when Louisiana was admitted into the Union.” However, in the course of that opinion it was said:
“ * * * Conceding, for sake of argument, that the bed of Sweet Lake was not subject to sale under the provisions of section 11 of Act 75 of 1880, as sea marsh, subject to tidal overflow, at 12i/¿ cents per acre, nevertheless the patents were signed by the Governor and by the register of the state land office, and were recorded in the state land office, and purported to convey an area of land described so as to- embrace the bed of the lake, and that is all that the act of the Legislature required in its declaration that such patents should be deemed valid and unassailable after 6 years. * * #»
The concession made by the court “for sake of argument” in that case was therefore nothing but dicta since the court had found that Sweet Lake was not presently navigable and not navigable in 1812. That statement was unnecessary for the opinion, had no application to the facts in the case, and therefore was not the law of the case and not binding or controlling in ■future cases. It was moreover a weak statement of dicta because it did not mention or analyze the articles of the Code, ran counter to the express public policy of this State and fundamental principles of the civil law, and was without foundation in reason or logic.
In Realty Operators, Inc., v. State Mineral Board, supra, the ownership of the bed of Lake Hatch was claimed under and by virtue of patents issued by the State. Lake Hatch was found to be a freshwater lake entirely surrounded by swamp or marshland, with no connection with any river or other natural outlet to the sea. Its navigability was an issue in the case, but in the course of the opinion this court concluded that the navigability of the lake was of no importance because, whether it was navigable or not, defendant’s right to question the validity of the patents had been foreclosed by failure to file suit within six years from the passage of Act No. 62 of 1912. However, after concluding that the issue of navigability was of no im *775 portance, the court went on and assumed for the sake of argument that, if the lake was navigable in 1812 and the State was the owner of its bed by virtue of its sovereignty, there was no restriction, constitutional or otherwise, placed upon the State at the time the patent was issued which prevented it from disposing of the bed or bottom to private individuals. The author of that opinion evidently overlooked, since he did not discuss, the public policy restraining the State from disposing of such lands, and the Code articles recognizing the insusceptibility of private ownership of the beds of navigable lakes and operating as a restriction and prohibition against the State’s disposing of such beds to private individuals. Moreover, in that opinion the court went on to say that, if there was any doubt respecting the validity of these patents insofar as they transferred title to the bed of this lake, the decision in the Sweet Lake case disposed of any right that the State had to question the legality of the title, quoting as authoriy therefor the dicta contained in the Sweet Lake case. In other words, in the Realty Operators case the court made the dicta in the Sweet Lake case the law applicable to that case.
The author of the majority opinion on rehearing in the instant case was the organ of the court in the case involving Lake Hatch (the Realty Operators case) which I am now discussing, and in the course of that opinion it was stated [202 La. 398, 12 So.2d 203]:
“The lake [Lake Hatch] is admittedly a freshwater lake not connected with any arm of the sea and, consequently, does not fall within the prohibition contained in Acts No. 106 of 1886, No. 1S3 of 1902 and No. 52 of 1904.”
By this statement he concedes that, if Lake Hatch were an arm of the sea, it would fall within the prohibitions contained in the acts enumerated. The acts enumerated have already been mentioned and discussed by me hereinabove, and, by providing that the beds and bottoms of bays bordering on or connected with the Gulf shall continue and remain the property of the State and no one shall own in fee simple any bottoms to such lands, expressly prohibit the State from alienating such lands and dedicate them to public use.
The author of that opinion was evidently of the opinion that, had Lake Hatch been an arm of the sea such as is Grand Bay, Act No. 106 of 1886, Act No. 153 of 1902, and Act No. 52 of 1904 would have prohibited its alienation, and the provisions of Act No. 62 of 1912 would not have been applicable, and there would have been no bar to the State’s instituting suit to annul or vacate the patent.
In the case of O’Brien v. State Mineral Board, supra, the court found as a fact that the navigability of the lakes and watercourses, title to which was there involved, could not be definitely determined from the record, and that the State Mineral Board’s attack on the patents was barred by the *777 provisions of Act No. 62 of 1912, and, under the authority of the dicta accepted and announced as law in the Realty Operators case, the past and present navigability of these waters was not considered. In other words, the holding in that case was based entirely on the holding of the Realty Operators case, which in turn was based on the dicta contained in the Sweet Lake case.
There was not complete agreement among the members of the court as to the soundness and correctness of some of the pronouncements contained in the opinion in the O’Brien case, because only two members of the court signed the opinion as written, and Chief Justice O’Niell, Justice Fournet (now Chief Justice), Justice Ponder, Justice Hamiter, and the writer of this dissent concurred in the decree. Chief Justice O’Niell concurred but considered that the case of Miami Corporation v. State, 186 La. 784, 173 So. 315, had been wrongly decided, and that the decision in the Realty Operators case could not be reconciled with that decision. Justice Hamiter, the organ of the court in the present case on original hearing, concurred for the reason that the State Mineral Board had failed to discharge its burden of proving the navigability in 1812 of the watercourses involved. By thus concurring in the decree Justice Hamiter evidently Was then of the opinion that, had the State Mineral Board proved that the watercourses were navigable in 1812, the provisions of Act No. 62 of 1912 would not have been applicable.
The last case to be considered and the one on which the opinion on first hearing principally relied is Humble Oil & Refining Co. v. State Mineral Board, supra, commonly called the “Duck Lake case”. In that case the title to the bottom of Duck Lake was involved, as it was included in the description in a patent issued by the State. It was conceded that Duck Lake was presently navigable and was navigable in 1812 when Louisiana was admitted into the Union. The State Mineral Board contended that the bed of this lake was sovereignty land which was not covered by, and could not have been embraced within, the Swamp Land Grant, and title could not be transferred to private individuals. In disposing of this contention the court very briefly concluded that, the transfer to private individuals being an accomplished fact, the State was accorded six years to contest the matter, and that failure to institute suit within that time constituted a ratification of the action of its officers in disposing of the property, citing in support thereof Atchafalaya Land Co. v. F. B. Williams Cypress Co., supra.
As I have heretofore pointed out, in the Atchafalaya Land Co. case no navigable arm of the Gulf or other navigable body of water was involved, and the statement which the author of the opinion in the Duck Lake case quotes in a footnote as authority for the holding in that case is, *779 again, nothing but mere dicta, and in any event could have had no application to a case in which a navigable body of water was involved.
Let me now summarize the questions of fact with reference to the navigability of the waters in the cases above discussed.
• In the Atchafalaya Land Co. case no navigable arm of the sea or other navigable body of water was involved, and that case could have no application to a case involving navigable waters. In the Sweet Lake case the court found as a fact that Sweet Lake was not presently navigable or navigable in 1812. Consequently, anything said in that case with reference to the applicability of Act No. 62 of 1912 to an action of the State to annul a patent to navigable waters was nothing but obiter dicta.
In the Realty Operators case the court said that the issue of navigability was of no importance, and that it was immaterial whether Lake Hatch was navigable or not. In the O’Brien case the navigability of the waters and watercourses could not be definitely determined. In those two cases, however, the court held that the State’s right to question the validity of the patents was barred by the provisions of Act No. 62 of 1912.
In the Duck Lake case it was conceded that Duck Lake was navigable presently and in 1812, and this is the only case in which the court found the lake or body of water involved to be navigable, and it is upon this decision that the majority of the court primarily relies.
The final judgments or decrees rendered by the court in the Atchafalaya Land Co. case and the Sweet Lake case were correct, and with them I am in full accord. The pronouncements or statements in the Realty Operators case to the effect that the navigability of Lake Hatch was of no importance and immaterial and that the action to annul the patent was barred by Act No. 62 of 1912 were incorrect. The court was in error in applying the provisions of Act No. 62 of 1912 without ascertaining the navigability of the waters and watercourses in the O’Brien case. The pronouncements and statements in the Realty Operators and O’Brien cases were erroneous and should be corrected. The Duck Lake case should be overruled because it is erroneous in the following particulars:
(1) In holding that patents to navigable waters are not subject to attack if not timely made under the provisions of Act No. 62 of 1912, thereby permitting these navigable waters to be privately owned in direct violation of, and contrary to, the express provisions of the articles of the Civil Code;
(2) In not strictly construing Act No. 62 of 1912 against this grantee in accord with State v. Bayou Johnson Oyster Co., supra, thus holding, in effect, that this act has, not expressly, but merely by implication, nullified the articles of the Code;
*781 (3) In contravening the public policy o,f this State since its existence as a State that navigable waters, title of which was in the State in its sovereign capacity, are insusceptible of private ownership;
(4) In disregarding and not following •and, in effect, overruling a long line of jurisprudence in which it had been consistently held that the beds of arms of the sea or navigable waters of this-State are insusceptible of private ownership. Milne v. Girodeau; Zeller v. Southern Yacht Club; Louisiana Navigation Co. v. Oyster Commission; State v. Bayou Johnson Oyster Co.; Miami Corporation v. State; Burns v. Crescent Rod & Gun Club; all cited supra;
(5) In disregarding the cardinal rules of statutory construction that statutes are to be construed consistently with public policy and against derogation of sovereignty and common right, and that repeals by implication are not favored and will not be indulged if there is any other reasonable construction (a reasonable construction in the instant case is that the words “transfer of property” and “patent” as used in the 1912 act were intended to apply only to transfer or patent to things susceptible of private ownership) ;
(6) In basing the holding and decision on the pronouncements or obiter dicta expressed in the Atchafalaya Land Co. case which had no application to a navigable body of water, and on the dicta which were contrary to the Code, the jurisprudence, and the public policy of the State.
One of the leading cases in our jurisprudence on the question of whether the beds of navigable waters are susceptible of private ownership is Miami Corporation v. State, 186 La. 784, 173 So. 315, 327. In that case the issue of title to a portion of Grand Lake, a navigable body of water, was before the court for determination. After a lengthy discussion this court said:
“ * * * We are further of the opinion that the bed or bottom of Grand Lake, a navigable body of water, including the area in controversy, which has been submerged since 1883, belongs to the State of Louisiana, by virtue of its sovereignty, it being a public thing and insusceptible of private ownership under the provisions of Articles 450 and 453 of the Revised Civil Code.”
In the course of that opinion the court said that a navigable body of water, regardless of whether it was a body of fresh water or the sea or an arm of the sea, is insusceptible of private ownership, and that this is of necessity the law because to hold otherwise “would be contrary to sound principles and public policy upon which the rule is predicated. It is the rule of property and of title in this State, and also a rule of public policy that the State, as a sovereignty, holds title to the beds of navigable bodies of water”.
That case became final in 1937, and Act No. 62 of 1912, although then in full force *783 and effect, was not mentioned or discussed. However, that fact does not detract in anyway from the authority of the case as pronouncing the rule of property and of title in this State and of public policy, that the State as a sovereign holds title at all times to the beds of navigable arms of the Gulf and other navigable waters, and that they are insusceptible of private ownership.
The holding in that case was not overruled, nor was it mentioned, in any of the cases discussed above except that in the O’Brien case an effort was made to distinguish it from the Sweet Lake and Realty Operators cases and the O’Brien case. The distinction which was made was that in the Miami Corporation .case Grand Lake was a large and important commercial waterway, whereas in the other cases the patents were to unimportant lakes and the beds of streams. To me, this is not a valid distinction, and the late Chief Justice O’Niell refused to accept this distinction as shown by his reasons given for concurring in the decree in the O’Brien case. However, it is significant that even in the O’Brien case the court said [209 La. 266, 24 So.2d 473]:
“The Miami case is consistent with the sound public policy on navigable waters as followed in the Constitution of 1921, which specifically forbids the agencies of the State of Louisiana from conveying any future title to. the bottoms of navigable waters.”
If the bed of a navigable arm of the sea and the beds of other navigable waters are susceptible of private ownership, as the majority of the court holds them to be, then the instant case overrules the decision in the Miami case which recognized as a rule of property and title of this State and also a rule of public policy that the State of Louisiana as a sovereign holds title at all times to the navigable arms of the Gulf and other navigable waters, and that they are insusceptible of private ownership. Moreover, in the instant case the majority of the court, by permitting an arm of the sea to be privately owned, is reinstating the holding in the Erwin case, supra, that water bottoms or beds of this kind are susceptible of private ownership, which was repudiated, shown to be incorrect, and expressly overruled in the Miami case.
In State v. Erwin, supra, this court recognized private ownership of the beds of navigable lakes or held that they were susceptible of private ownership. That case was expressly overruled in Miami Corporation v. State, supra, even though the ruling in State v. Erwin may have established a rule of property, and in overruling the Erwin case this court said in the Miami case:
“Even in regard to the rules of property, the maxim of stare decisis is not absolutely inflexible. This is particularly true when it is shown that by following, rather than by disregarding previous erroneous decisions from which an evil resulted, the community would suffer greater damage. In *785 such situation, the courts have overruled the prior cases, in order to correct the jurisprudence. In Louisiana, this court has never hesitated to overrule a line of decisions where they establish a rule of property where greater harm would result from perpetuating the error rather than from correcting
This statement from the Miami case is appropriate here. Decisions which establish a rule of property, in my opinion should not be lightly regarded or overruled except for the most compelling reasons, as stated by me in my dissent in the case of Lee v. Jones, 224 La. 231, 69 So.2d 26, 33; but I am convinced that the decision rendered in the Duck Lake case and the erroneous statements made in the Realty Operators case and the O’Brien case should be corrected and not perpetuated in the jurisprudence, and that a greater harm would result from perpetuating the error than from correcting it.
The decision rendered by the majority of the court in the instant case is one of far-reaching effect, and it takes no seer or prophet to foretell that as a result of this decision private individuals will successfully claim title under old patents to the beds of numerous bays on the Gulf, large lakes, etc., from which oil is being or will be produced, and the holding that such properties are susceptible of private ownership will deprive the people of this State of tremendous sums of money, running into millions, which, I say with due respect to the views of the majority, legally belong to them. For the reasons I have given, I therefore cannot and do not subscribe to the majority opinion.

. The 1921 Constitution is the first which contains the prohibition against the alienation of the fee of the bed of anybody of navigable water (except for purposes of reclamation). Art. 4, sec. 2, La.Const. of 1921. The inclusion in the Constitution . of this prohibition against the Legislature’s changing in any way the public policy of this State against alienating the beds of navigable bodies of water demonstrates the importance of this policy to the people and to the State.